# RUNYON ET UX., DBA BOBBE'S SCHOOL v. McCRARY ET AL.

No. 75–62.   Argued April 26, 1976—Decided June 25, 1976*

---

*Together with No. 75–66, *Fairfax-Brewster School, Inc.* v. *Gonzales et al.;* No. 75–278, *Southern Independent School Assn.* v. *McCrary et al.;* and No. 75–306, *McCrary et al.* v. *Runyon et ux., dba Bobbe's School, et al.,* also on certiorari to the same court.

162

STEWART, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined. POWELL, J., *post*, p. 186, and STEVENS, J., *post*, p. 189, filed concurring opinions. WHITE, J., filed a dissenting opinion, in which REHNQUIST, J., joined, *post*, p. 192.

*Louis Koutoulakos* argued the cause and filed a brief for petitioners in No. 75–62. *Andrew A. Lipscomb* argued the cause and filed briefs for petitioner in No. 75–66. *Geo. S. Leonard* argued the cause for petitioner

in No. 75–278. With him on the briefs were *Sam Clammer* and *A. Gilmore Flues. Roderic V. O. Boggs* argued the cause for petitioners in No. 75–306. With him on the briefs were *Allison W. Brown, Jr.,* and *Robert M. Alexander.*

*Mr. Brown* argued the cause for respondents in Nos. 75–62, 75–66, and 75–278. With him on the briefs were *Mr. Alexander* and *Mr. Boggs. Mr. Lipscomb* argued the cause and filed a brief for respondent Fairfax-Brewster School, Inc., in No. 75–306. *Mr. Koutoulakos* filed a reply brief for respondents Runyon et ux. in No. 75–306.†

Mr. Justice Stewart delivered the opinion of the Court.

The principal issue presented by these consolidated cases is whether a federal law, namely 42 U. S. C. § 1981, prohibits private schools from excluding qualified children solely because they are Negroes.

I

The respondents in No. 75–62, Michael McCrary and Colin Gonzales, are Negro children. By their parents,

---

†*Lawrence R. Metsch* filed a brief for Dade Christian Schools, Inc., as *amicus curiae* urging reversal in Nos. 75–62, 75–66, and 75–278.

Briefs of *amici curiae* urging affirmance in Nos. 75–62, 75–66, and 75–278 were filed by *Solicitor General Bork, Assistant Attorney General Pottinger, Deputy Solicitor General Wallace, John P. Rupp, Brian K. Landsberg,* and *Judith E. Wolf* for the United States; by *Thomas J. Schwab* for the Council for American Private Education et al.; and by *Terrence Roche Murphy, Thomas C. Matthews, Jr.,* and *David Rubin* for the National Education Assn. *Larry M. Lavinsky, Arnold Forster, Theodore R. Mann, Paul S. Berger, Melvin L. Wulf, Samuel Rabinove,* and *Nathaniel Jones* filed a brief for the Anti-Defamation League of B'nai B'rith et al. as *amici curiae* urging affirmance in No. 75–62.

they filed a class action against the petitioners in No. 75–62, Russell and Katheryne Runyon, who are the proprietors of Bobbe's School in Arlington, Va. Their complaint alleged that they had been prevented from attending the school because of the petitioners' policy of denying admission to Negroes, in violation of 42 U. S. C. § 1981[1] and Title II of the Civil Rights Act of 1964, 78 Stat. 243, 42 U. S. C. § 2000a *et seq.*[2] They sought declaratory and injunctive relief and damages. On the same day Colin Gonzales, the respondent in No. 75–66, filed a similar complaint by his parents against the petitioner in No. 75–66, Fairfax-Brewster School, Inc., located in Fairfax County, Va. The petitioner in No. 75–278, the Southern Independent School Association, sought and was granted permission to intervene as a party defendant in the suit against the Runyons. That organization is a nonprofit association composed of six state private school associations, and represents 395 private schools. It is stipulated that many of these schools deny admission to Negroes.

The suits were consolidated for trial. The findings of the District Court, which were left undisturbed by the Court of Appeals, were as follows. Bobbe's School opened in 1958 and grew from an initial enrollment of five students to 200 in 1972. A day camp was begun in 1967 and has averaged 100 children per year. The Fairfax-Brewster School commenced operations in 1955 and opened a summer day camp in 1956. A total of

---

[1] Title 42 U. S. C. § 1981 provides:

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

[2] The respondents withdrew their Title II claim before trial.

223 students were enrolled at the school during the 1972–1973 academic year, and 236 attended the day camp in the summer of 1972. Neither school has ever accepted a Negro child for any of its programs.

In response to a mailed brochure addressed "resident" and an advertisement in the "Yellow Pages" of the telephone directory, Mr. and Mrs. Gonzales telephoned and then visited the Fairfax-Brewster School in May 1969. After the visit, they submitted an application for Colin's admission to the day camp. The school responded with a form letter, which stated that the school was "unable to accommodate [Colin's] application." Mr. Gonzales telephoned the school. Fairfax-Brewster's Chairman of the Board explained that the reason for Colin's rejection was that the school was not integrated. Mr. Gonzales then telephoned Bobbe's School, from which the family had also received in the mail a brochure addressed to "resident." In response to a question concerning that school's admissions policies, he was told that only members of the Caucasian race were accepted. In August 1972, Mrs. McCrary telephoned Bobbe's School in response to an advertisement in the telephone book. She inquired about nursery school facilities for her son, Michael. She also asked if the school was integrated. The answer was no.

Upon these facts, the District Court found that the Fairfax-Brewster School had rejected Colin Gonzales' application on account of his race and that Bobbe's School had denied both children admission on racial grounds. The court held that 42 U. S. C. § 1981 makes illegal the schools' racially discriminatory admissions policies. It therefore enjoined Fairfax-Brewster School and Bobbe's School and the member schools of the Southern Independent School Association [3] from discrim-

---

[3] The District Court determined that the suit could not be maintained as a class action.

inating against applicants for admission on the basis of race. The court awarded compensatory relief to Mr. and Mrs. McCrary, Michael McCrary, and Colin Gonzales.[4] In a previous ruling the court had held that the damages claim of Mr. and Mrs. Gonzales was barred by Virginia's two-year statute of limitations for personal injury actions, "borrowed" for § 1981 suits filed in that State. Finally, the court assessed attorneys' fees of $1,000 against each school. 363 F. Supp. 1200 (ED Va. 1973).

The Court of Appeals for the Fourth Circuit, sitting en banc, affirmed the District Court's grant of equitable and compensatory relief and its ruling as to the applicable statute of limitations, but reversed its award of attorneys' fees. 515 F. 2d 1082 (1975). Factually, the court held that there was sufficient evidence to support the trial court's finding that the two schools had discriminated racially against the children. On the basic issue of law, the court agreed that 42 U. S. C. § 1981 is a "limitation upon private discrimination, and its enforcement in the context of this case is not a deprivation of any right of free association or of privacy of the defendants, of the intervenor, or of their pupils or patrons." 515 F. 2d, at 1086. The relationship the parents had sought to enter into with the schools was in the court's view undeniably contractual in nature, within the meaning of § 1981, and the court rejected the schools' claim that § 1981 confers no right of action unless the contractual relationship denied to Negroes is available to all whites. 515 F. 2d, at 1087. Finally, the appellate

---

[4] For the embarrassment, humiliation, and mental anguish which the parents and children suffered, the Court awarded Colin Gonzales $2,000 against the Fairfax-Brewster School and $500 against Bobbe's School. Michael McCrary was awarded damages of $1,000, and Mr. and Mrs. McCrary $2,000, against Bobbe's School.

court rejected the schools' contention that their racially discriminatory policies are protected by a constitutional right of privacy. "When a school holds itself open to the public . . . or even to those applicants meeting established qualifications, there is no perceived privacy of the sort that has been given constitutional protection." *Id.*, at 1088.

We granted the petitions for certiorari filed by the Fairfax-Brewster School, No. 75–66; Bobbe's School, No. 75–62; and the Southern Independent School Association, No. 75–278, to consider whether 42 U. S. C. § 1981 prevents private schools from discriminating racially among applicants. 423 U. S. 945. We also granted the cross-petition of Michael McCrary, Colin Gonzales, and their parents, No. 75–306, to determine the attorneys' fees and statute of limitations issues. *Ibid.*

## II

It is worth noting at the outset some of the questions that these cases do not present. They do not present any question of the right of a private social organization to limit its membership on racial or any other grounds.[5] They do not present any question of the right of a private school to limit its student body to boys, to girls, or to adherents of a particular religious faith, since 42 U. S. C. § 1981 is in no way addressed to such categories of selectivity. They do not even present the application of § 1981 to private sectarian schools that practice *racial* exclusion on religious grounds.[6] Rather, these cases

---

[5] See generally *Tillman* v. *Wheaton-Haven Recreation Assn.*, 410 U. S. 431, 439–440; *Moose Lodge No. 107* v. *Irvis*, 407 U. S. 163.

[6] Nothing in this record suggests that either the Fairfax-Brewster School or Bobbe's Private School excludes applicants on religious grounds, and the Free Exercise Clause of the First Amendment is thus in no way here involved.

present only two basic questions: [7] whether § 1981 prohibits private, commercially operated, nonsectarian schools from denying admission to prospective students because they are Negroes, and, if so, whether that federal law is constitutional as so applied.

A. *Applicability of § 1981*

It is now well established that § 1 of the Civil Rights Act of 1866, 14 Stat. 27, 42 U. S. C. § 1981, prohibits racial discrimination in the making and enforcement of private contracts.[8]  See *Johnson* v. *Railway Express*

---

[7] Apart, of course, from the statute of limitations and attorneys' fees issues involved in No. 75–306, and dealt with in Part III of this opinion.

[8] The historical note appended to the portion of the Civil Rights Act of 1866, presently codified in 42 U. S. C. § 1981, indicates that § 1981 is derived solely from § 16 of the Act of May 31, 1870, 16 Stat. 144.  The omission from the historical note of any reference to § 18 of the 1870 Act, which re-enacted § 1 of the 1866 Act, or to the 1866 Act itself reflects a similar omission from the historical note that was prepared in connection with the 1874 codification of federal statutory law.  The earlier note was appended to the draft version of the 1874 revision prepared by three commissioners appointed by Congress.

On the basis of this omission, at least one court has concluded, in an opinion that antedated *Johnson* v. *Railway Express Agency*, 421 U. S. 454, that § 1981 is based exclusively on the Fourteenth Amendment and does not, therefore, reach private action. *Cook* v. *Advertiser Co.*, 323 F. Supp. 1212 (MD Ala.), aff'd on other grounds, 458 F. 2d 1119 (CA5).  But the holding in that case ascribes an inappropriate significance to the historical note presently accompanying § 1981, and thus implicitly to the earlier revisers' note.

The commissioners who prepared the 1874 draft revision were appointed pursuant to the Act of June 27, 1866, 14 Stat. 74, re-enacted by the Act of May 4, 1870, c. 72, 16 Stat. 96.  They were given authority to "revise, simplify, arrange, and consolidate all statutes of the United States," Act of June 27, 1866, § 1, 14 Stat. 74, by "bring[ing] together all statutes and parts of statutes which, from

*Agency,* 421 U. S. 454, 459–460; *Tillman* v. *Wheaton-Haven Recreation Assn.,* 410 U. S. 431, 439–440. Cf. *Jones* v. *Alfred H. Mayer Co.,* 392 U. S. 409, 441–443, n. 78.

---

similarity of subject, ought to be brought together, *omitting redundant or obsolete enactments* . . . ." § 2, 14 Stat. 75 (emphasis added). The commissioners also had the authority under § 3 of the Act of June 27, 1866, to "designate such statutes or parts of statutes as, in their judgment, ought to be repealed, with their reasons for such repeal." 14 Stat. 75.

It is clear that the commissioners did not intend to recommend to Congress, pursuant to their authority under § 3 of the Act of June 27, 1866, that any portion of § 1 of the Civil Rights Act of 1866 be repealed upon the enactment of the 1874 revision. When the commissioners were exercising their § 3 power of recommendation, they so indicated, in accordance with the requirements of § 3. See 1 Draft Revision of the United States Statutes, Title XXVI, §§ 8, 13 (1872). No indication of a recommended change was noted with respect to the section of the draft which was to become § 1981. It is thus most plausible to assume that the revisers omitted a reference to § 1 of the 1866 Act or § 18 of the 1870 Act either inadvertently or on the assumption that the relevant language in § 1 of the 1866 Act was superfluous in light of the closely parallel language in § 16 of the 1870 Act.

We have, in past decisions, expressed the view that § 16 of the 1870 Act was merely a re-enactment, with minor changes, of certain language in § 1 of the 1866 Act. *E. g., Georgia* v. *Rachel,* 384 U. S. 780, 790–791. If this is so, then an assumption on the part of the revisers that the language of the 1866 Act was superfluous was perfectly accurate. But even assuming that the purpose behind the enactment of § 16 of the 1870 Act was narrower than that behind the enactment of relevant language in § 1 of the 1866 Act— and thus that the revisers' hypothetical assumption was wrong—there is still no basis for inferring that Congress did not understand the draft legislation which eventually became 42 U. S. C. § 1981 to be drawn from both § 16 of the 1870 Act and § 1 of the 1866 Act.

To hold otherwise would be to attribute to Congress an intent to repeal a major piece of Reconstruction legislation on the basis of an unexplained omission from the revisers' marginal notes. Such an inference would be inconsistent with Congress' delineation in § 3

In *Jones* the Court held that the portion of § 1 of the Civil Rights Act of 1866 presently codified as 42 U. S. C. § 1982 prohibits private racial discrimination in the sale or rental of real or personal property. Relying on the legislative history of § 1, from which both § 1981 and § 1982 derive, the Court concluded that Congress intended to prohibit "all racial discrimination, private and public, in the sale . . . of property," 392 U. S., at 437, and that this prohibition was within Congress' power under § 2 of the Thirteenth Amendment "rationally to determine what are the badges and the incidents of slavery, and . . . to translate that determination into effective legislation." 392 U. S., at 440.

As the Court indicated in *Jones, supra,* at 441–443, n. 78, that holding necessarily implied that the portion of § 1 of the 1866 Act presently codified as 42 U. S. C. § 1981 likewise reaches purely private acts of racial discrimination. The statutory holding in *Jones* was that the "[1866] Act was designed to do just what its terms suggest: to prohibit all racial discrimination, whether or not under color of law, with respect to the rights enumerated therein—including the right to purchase or lease property," 392 U. S., at 436. One of the "rights enumerated" in § 1 is "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . . ." 14 Stat. 27. Just as in *Jones* a Negro's § 1 right to purchase property on equal terms with whites was violated when a private person refused to sell to the prospective purchaser solely because he was a Negro, so also a Negro's § 1 right to "make and enforce contracts" is violated if a private offeror refuses to extend to a Negro,

of the Act of June 27, 1866, of specific procedures to be followed in connection with the submission of substantive proposals by the revisers. It would also conflict with the square holding of this Court in *Johnson* v. *Railway Express Agency, supra,* that § 1981 reaches private conduct.

solely because he is a Negro, the same opportunity to enter into contracts as he extends to white offerees.[9]

The applicability of the holding in *Jones* to § 1981 was confirmed by this Court's decisions in *Tillman* v. *Wheaton-Haven Recreation Assn., supra,* and *Johnson* v. *Railway Express Agency, Inc., supra.* In *Tillman* the petitioners urged that a private swimming club had violated 42 U. S. C. §§ 1981, 1982, and 2000a *et seq.* by enforcing a guest policy that discriminated against Negroes. The Court noted that "[t]he operative language of both § 1981 and § 1982 is traceable to the Act of April 9, 1866, c. 31, § 1, 14 Stat. 27." 410 U. S., at 439. Referring to its earlier rejection of the respondents' contention that Wheaton-Haven was exempt from § 1982 under the private-club exception of the Civil Rights Act of 1964, the Court concluded: "In light of the historical interrelationship between § 1981 and § 1982 [there is] no reason to construe these sections differently when applied, on these facts, to the claim of Wheaton-Haven that it is a private club." 410 U. S., at 440. Accordingly the Court remanded the case to the District Court for further proceedings "free of the misconception that

---

[9] The petitioning schools and school association rely on a statement in *Norwood* v. *Harrison,* 413 U. S. 455, 469, that "private bias [in the admission of students to private schools] is not barred by the Constitution, *nor does it invoke any sanction of laws,* but neither can it call on the Constitution for material aid from the State." (Emphasis added.) They argue that this statement supports their contention that § 1981 does not proscribe private racial discrimination that interferes with the formation of contracts for educational services. But *Norwood* involved no issue concerning the applicability of § 1981 to such discrimination. The question there was rather whether a state statute providing free textbooks to students attending private segregated schools violated the Equal Protection Clause of the Fourteenth Amendment. Indeed, *Norwood* expressly noted that "some private discrimination is subject to special remedial legislation in certain circumstances under § 2 of the Thirteenth Amendment . . . ." 413 U. S., at 470.

Wheaton-Haven is exempt from §§ 1981, 1982, and 2000a." *Ibid.* In *Johnson* v. *Railway Express Agency, supra,* the Court noted that § 1981 "relates primarily to racial discrimination in the making and enforcement of contracts," 421 U. S., at 459, and held unequivocally "that § 1981 affords a federal remedy against discrimination in private employment on the basis of race." *Id.,* at 459–460.

It is apparent that the racial exclusion practiced by the Fairfax-Brewster School and Bobbe's Private School amounts to a classic violation of § 1981. The parents of Colin Gonzales and Michael McCrary sought to enter into contractual relationships with Bobbe's School for educational services. Colin Gonzales' parents sought to enter into a similar relationship with the Fairfax-Brewster School. Under those contractual relationships, the schools would have received payments for services rendered, and the prospective students would have received instruction in return for those payments. The educational services of Bobbe's School and the Fairfax-Brewster School were advertised and offered to members of the general public.[10] But neither school offered serv-

---

[10] These cases do not raise the issue of whether the "private club or other [private] establishment" exemption in § 201 (e) of the Civil Rights Act of 1964, 42 U. S. C. § 2000a (e), operates to narrow § 1 of the Civil Rights Act of 1866. As the Court of Appeals implied, that exemption, if applicable at all, comes into play only if the establishment is "not in fact open to the public . . . ." 42 U. S. C. § 2000a (e). See 515 F. 2d 1082, 1088–1089. Both Bobbe's School and the Fairfax-Brewster School advertised in the "Yellow Pages" of the telephone directory and both used mass mailings in attempting to attract students. As the Court of Appeals observed, these "schools are private only in the sense that they are managed by private persons and they are not direct recipients of public funds. Their actual and potential constituency, however, is more public than private. They appeal to the parents of all children in the area who can meet their academic and other admission requirements. This is

ices on an equal basis to white and nonwhite students. As the Court of Appeals held, "there is ample evidence in the record to support the trial judge's factual determinations . . . [that] Colin [Gonzales] and Michael [McCrary] were denied admission to the schools because of their race." 515 F. 2d, at 1086. The Court of Appeals' conclusion that § 1981 was thereby violated follows inexorably from the language of that statute, as construed in *Jones, Tillman,* and *Johnson.*

The petitioning schools and school association argue principally that § 1981 does not reach private acts of racial discrimination. That view is wholly inconsistent with *Jones'* interpretation of the legislative history of § 1 of the Civil Rights Act of 1866, an interpretation that was reaffirmed in *Sullivan* v. *Little Hunting Park, Inc.,* 396 U. S. 229, and again in *Tillman* v. *Wheaton-Haven Recreation Assn., supra.* And this consistent interpretation of the law necessarily requires the conclusion that § 1981, like § 1982, reaches private conduct. See *Till-*

---

clearly demonstrated in this case by the public advertisements." *Id.,* at 1089.

The pattern of exclusion is thus directly analogous to that at issue in *Sullivan* v. *Little Hunting Park, Inc.,* 396 U. S. 229, and *Tillman* v. *Wheaton-Haven Recreation Assn.,* 410 U. S. 431, where the so-called private clubs were open to all objectively qualified whites—i. e., those living within a specified geographic area.

Moreover, it is doubtful that a plausible "implied repeal" argument could be made in this context in any event. Implied repeals occur if two Acts are in irreconcilable conflict. *Radzanower* v. *Touche Ross & Co.,* 426 U. S. 148, 154–155. Title II of the Civil Rights Act of 1964, of which the "private club" exemption is a part, does not by its terms reach private schools. Since there would appear to be no potential for overlapping application of § 1981 and Title II of the 1964 Act with respect to racial discrimination practiced by private schools, there would also appear to be no potential for conflict between § 1981 and Title II's "private club" exemption in this context. See Note, The Desegregation of Private Schools: Is Section 1981 the Answer?, 48 N. Y. U. L. Rev. 1147, 1159 (1973).

*man* v. *Wheaton-Haven Recreation Assn.,* 410 U. S., at 439–440; *Johnson* v. *Railway Express Agency,* 421 U. S., at 459–460.

It is noteworthy that Congress in enacting the Equal Employment Opportunity Act of 1972, 86 Stat. 103, as amended, 42 U. S. C. § 2000e *et seq.* (1970 ed., Supp. IV), specifically considered and rejected an amendment that would have repealed the Civil Rights Act of 1866, as interpreted by this Court in *Jones,* insofar as it affords private-sector employees a right of action based on racial discrimination in employment. See *Johnson* v. *Railway Express Agency, supra,* at 459.[11] There could

---

[11] Senator Hruska proposed an amendment which would have made Title VII of the Civil Rights Act of 1964 and the Equal Pay Act the exclusive sources of federal relief for employment discrimination. 118 Cong. Rec. 3371 (1972). Senator Williams, the floor manager of the pending bill and one of its original sponsors, argued against the proposed amendment on the ground that "[i]t is not our purpose to repeal existing civil rights laws" and that to do so "would severely weaken our overall effort to combat the presence of employment discrimination." *Ibid.* Senator Williams specifically noted: "The law against employment discrimination did not begin with title VII and the EEOC, nor is it intended to end with it. The right of individuals to bring suits in Federal courts to redress individual acts of discrimination, including employment discrimination was first provided by the Civil Rights Acts of 1866 and 1871, 42 U. S. C. sections 1981, 1983. It was recently stated by the Supreme Court in the case of Jones v. Mayer, that these acts provide fundamental constitutional guarantees. In any case, the courts have specifically held that title VII and the Civil Rights Acts of 1866 and 1871 are not mutually exclusive, and must be read together to provide alternative means to redress individual grievances. Mr. President, the amendment of the Senator from Nebraska will repeal the first major piece of civil rights legislation in this Nation's history. We cannot do that." *Ibid.* The Senate was persuaded by Senator Williams' entreaty that it not "strip from [the] individual his rights that have been established, going back to the first Civil Rights Law of 1866," *id.,* at 3372, and Senator Hruska's proposed amendment was rejected. *Id.,* at 3372–3373.

hardly be a clearer indication of congressional agreement with the view that § 1981 *does* reach private acts of racial discrimination. Cf. *Flood* v. *Kuhn,* 407 U. S. 258, 269–285; *Joint Industry Board* v. *United States,* 391 U. S. 224, 228–229. In these circumstances there is no basis for deviating from the well-settled principles of *stare decisis* applicable to this Court's construction of federal statutes. See *Edelman* v. *Jordan,* 415 U. S. 651, 671 n. 14.[12]

## B. *Constitutionality of § 1981 as Applied*

The question remains whether § 1981, as applied, violates constitutionally protected rights of free association and privacy, or a parent's right to direct the education of his children.[13]

### 1. *Freedom of Association*

In *NAACP* v. *Alabama,* 357 U. S. 449, and similar decisions, the Court has recognized a First Amendment right "to engage in association for the advancement of beliefs and ideas . . . ." *Id.,* at 460. That right is protected because it promotes and may well be essential to the "[e]ffective advocacy of both public and private points of view, particularly controversial ones" that the First Amendment is designed to foster. *Ibid.* See *Buckley* v. *Valeo,* 424 U. S. 1, 15; *NAACP* v. *Button,* 371 U. S. 415.

---

[12] The Court in *Edelman* stated as follows:

"In the words of Mr. Justice Brandeis: '*Stare decisis* is usually the wise policy, because in most matters it is more important that the applicable rule of law be settled than that it be settled right. . . . This is commonly true even where the error is a matter of serious concern, provided correction can be had by legislation. . . .'" 415 U. S., at 671 n. 14 (citation omitted).

[13] It is clear that the schools have standing to assert these arguments on behalf of their patrons. See *Pierce* v. *Society of Sisters,* 268 U. S. 510, 535–536.

From this principle it may be assumed that parents have a First Amendment right to send their children to educational institutions that promote the belief that racial segregation is desirable, and that the children have an equal right to attend such institutions. But it does not follow that the *practice* of excluding racial minorities from such institutions is also protected by the same principle. As the Court stated in *Norwood* v. *Harrison,* 413 U. S. 455, "the Constitution . . . places no value on discrimination," *id.,* at 469, and while "[i]nvidious private discrimination may be characterized as a form of exercising freedom of association protected by the First Amendment . . . it has never been accorded affirmative constitutional protections. And even some private discrimination is subject to special remedial legislation in certain circumstances under § 2 of the Thirteenth Amendment; Congress has made such discrimination unlawful in other significant contexts." *Id.,* at 470. In any event, as the Court of Appeals noted, "there is no showing that discontinuance of [the] discriminatory admission practices would inhibit in any way the teaching in these schools of any ideas or dogma." 515 F. 2d, at 1087.

### 2. *Parental Rights*

In *Meyer* v. *Nebraska,* 262 U. S. 390, the Court held that the liberty protected by the Due Process Clause of the Fourteenth Amendment includes the right "to acquire useful knowledge, to marry, establish a home and bring up children," *id.,* at 399, and, concomitantly, the right to send one's children to a private school that offers specialized training—in that case, instruction in the German language. In *Pierce* v. *Society of Sisters,* 268 U. S. 510, the Court applied "the doctrine of *Meyer* v. *Nebraska,*" *id.,* at 534, to hold unconstitutional an Oregon law requiring the parent, guardian, or other person having custody of a child between 8 and 16 years of age

to send that child to public school on pain of criminal liability. The Court thought it "entirely plain that the [statute] unreasonably interferes with the liberty of parents and guardians to direct the upbringing and education of children under their control." *Id.*, at 534–535. In *Wisconsin* v. *Yoder*, 406 U. S. 205, the Court stressed the limited scope of *Pierce*, pointing out that it lent "no support to the contention that parents may replace state educational requirements with their own idiosyncratic views of what knowledge a child needs to be a productive and happy member of society" but rather "held simply that while a State may posit [educational] standards, it may not pre-empt the educational process by requiring children to attend public schools." *Id.*, at 239 (WHITE, J., concurring). And in *Norwood* v. *Harrison*, 413 U. S. 455, the Court once again stressed the "limited scope of *Pierce*," *id.*, at 461, which simply "affirmed the right of private schools to exist and to operate . . . ." *Id.*, at 462.

It is clear that the present application of § 1981 infringes no parental right recognized in *Meyer, Pierce, Yoder*, or *Norwood*. No challenge is made to the petitioner schools' right to operate or the right of parents to send their children to a particular private school rather than a public school. Nor do these cases involve a challenge to the subject matter which is taught at any private school. Thus, the Fairfax-Brewster School and Bobbe's School and members of the intervenor association remain presumptively free to inculcate whatever values and standards they deem desirable. *Meyer* and its progeny entitle them to no more.

## 3. *The Right of Privacy*

The Court has held that in some situations the Constitution confers a right of privacy. See *Roe* v. *Wade*, 410 U. S. 113, 152–153; *Eisenstadt* v. *Baird*, 405 U. S. 438, 453; *Stanley* v. *Georgia*, 394 U. S. 557, 564–565; *Griswold*

v. *Connecticut,* 381 U. S. 479, 484–485. See also *Loving* v. *Virginia,* 388 U. S. 1, 12; *Skinner* v. *Oklahoma ex rel. Williamson,* 316 U. S. 535, 541.

While the application of § 1981 to the conduct at issue here—a private school's adherence to a racially discriminatory admissions policy—does not represent governmental intrusion into the privacy of the home or a similarly intimate setting,[14] it does implicate parental interests. These interests are related to the procreative rights protected in *Roe* v. *Wade, supra,* and *Griswold* v. *Connecticut, supra.* A person's decision whether to bear a child and a parent's decision concerning the manner in which his child is to be educated may fairly be characterized as exercises of familial rights and responsibilities. But it does not follow that because government is largely or even entirely precluded from regulating the child-bearing decision, it is similarly restricted by the Constitution from regulating the implementation of parental decisions concerning a child's education.

The Court has repeatedly stressed that while parents have a constitutional right to send their children to private schools and a constitutional right to select private schools that offer specialized instruction, they have no constitutional right to provide their children with private school education unfettered by reasonable government regulation. See *Wisconsin* v. *Yoder, supra,* at 213; *Pierce* v. *Society of Sisters, supra,* at 534; *Meyer* v. *Nebraska,* 262 U. S., at 402.[15] Indeed, the Court in *Pierce* expressly acknowledged "the power of the State

---

[14] See n. 10, *supra.*

[15] The *Meyer-Pierce-Yoder* "parental" right and the privacy right, while dealt with separately in this opinion, may be no more than verbal variations of a single constitutional right. See *Roe* v. *Wade,* 410 U. S. 113, 152–153 (citing *Meyer* v. *Nebraska* and *Pierce* v. *Society of Sisters* for the proposition that this Court has recognized a constitutional right of privacy).

reasonably to regulate all schools, to inspect, supervise and examine them, their teachers and pupils . . . ." 268 U. S., at 534. See also *Prince* v. *Massachusetts,* 321 U. S. 158, 166.

Section 1981, as applied to the conduct at issue here, constitutes an exercise of federal legislative power under § 2 of the Thirteenth Amendment fully consistent with *Meyer, Pierce,* and the cases that followed in their wake. As the Court held in *Jones* v. *Alfred H. Mayer Co., supra:* "It has never been doubted . . . 'that the power vested in Congress to enforce [the Thirteenth Amendment] by appropriate legislation' . . . includes the power to enact laws 'direct and primary, operating upon the acts of individuals, whether sanctioned by State legislation or not.' " 392 U. S., at 438 (citation omitted). The prohibition of racial discrimination that interferes with the making and enforcement of contracts for private educational services furthers goals closely analogous to those served by § 1981's elimination of racial discrimination in the making of private employment contracts [16] and, more generally, by § 1982's guarantee that "a dollar in the hands of a Negro will purchase the same thing as a dollar in the hands of a white man." 392 U. S., at 443.

## III

### A. *Statute of Limitations*

The District Court held that the damages suit of the petitioners in No. 75–306, Mr. and Mrs. Gonzales, which was initiated 3½ years after their cause of action accrued, was barred by the statute of limitations. This

---

[16] The Court has recognized in similar contexts the link between equality of opportunity to obtain an education and equality of employment opportunity. See *McLaurin* v. *Oklahoma State Regents,* 339 U. S. 637; *Sweatt* v. *Painter,* 339 U. S. 629.

ruling was affirmed by the Court of Appeals. The petitioners contend that both courts erred in "borrowing" the wrong Virginia statute of limitations.

Had Congress placed a limit upon the time for bringing an action under § 1981, that would, of course, end the matter. But Congress was silent. And "[a]s to actions at law," which a damages suit under § 1981 clearly is, "the silence of Congress has been interpreted to mean that it is federal policy to adopt the local law of limitation." *Holmberg* v. *Armbrecht,* 327 U. S. 392, 395. See *Johnson* v. *Railway Express Agency,* 421 U. S., at 462; *Rawlings* v. *Ray,* 312 U. S. 96; *O'Sullivan* v. *Felix,* 233 U. S. 318; *Chattanooga Foundry* v. *Atlanta,* 203 U. S. 390. As the Court stated in *Holmberg, supra,* at 395: "The implied absorption of State statutes of limitation within the interstices of the federal enactments is a phase of fashioning remedial details where Congress has not spoken but left matters for judicial determination within the general framework of familiar legal principles."

At the time of this litigation Virginia had not enacted a statute that specifically governed civil rights suits. In the absence of such a specific statute, the District Court and the Court of Appeals held that the first sentence of Va. Code Ann. § 8–24 (1957) provides the relevant limitations period for a § 1981 action: "Every action for personal injuries shall be brought within two years next after the right to bring the same shall have accrued." The petitioners assert that this provision applies only to suits predicated upon actual physical injury, and that the correct limitation period is five years, by virtue of the second sentence of § 8–24, which comprehends all other "personal" actions:

> "Every personal action, for which no limitation is otherwise prescribed, shall be brought within five

years next after the right to bring the same shall have accrued, if it be for a matter of such nature that in case a party die it can be brought by or against his representative; and, if it be for a matter not of such nature, shall be brought within one year next after the right to bring the same shall have accrued."

The petitioners' contention is certainly a rational one, but we are not persuaded that the Court of Appeals was mistaken in applying the two-year state statute. The issue was not a new one for that court, for it had given careful consideration to the question of the appropriate Virginia statute of limitations to be applied in federal civil rights litigation on at least two previous occasions. *Allen* v. *Gifford,* 462 F. 2d 615; *Almond* v. *Kent,* 459 F. 2d 200. We are not disposed to displace the considered judgment of the Court of Appeals on an issue whose resolution is so heavily contingent upon an analysis of state law, particularly when the established rule has been relied upon and applied in numerous suits filed in the Federal District Courts in Virginia.[17] In other situations in which a federal right has depended upon the interpretation of state law, "the Court has accepted the interpretation of state law in which the District Court and the Court of Appeals have concurred even if an examination of the state-law issue without such guidance might have justified a different conclusion." *Bishop* v.

---

[17] See, *e. g., Van Horn* v. *Lukhard,* 392 F. Supp. 384, 391 (ED Va.); *Edgerton* v. *Puckett,* 391 F. Supp. 463 (WD Va.); *Wilkinson* v. *Hamel,* 381 F. Supp. 768, 769 (WD Va.); *Cradle* v. *Superintendent, Correctional Field Unit #7,* 374 F. Supp. 435, 437 n. 3 (WD Va.); *Taliaferro* v. *State Council of Higher Education,* 372 F. Supp. 1378, 1383 (ED Va.); *Landman* v. *Brown,* 350 F. Supp. 303, 306 (ED Va.); *Sitwell* v. *Burnette,* 349 F. Supp. 83, 85–86 (WD Va).

*Wood*, 426 U. S. 341, 346, and n. 10, citing, *inter alia*, *United States* v. *Durham Lumber Co.*, 363 U. S. 522; *Propper* v. *Clark*, 337 U. S. 472; *Township of Hillsborough* v. *Cromwell*, 326 U. S. 620.

Moreover, the petitioners have not cited any Virginia court decision to the effect that the term "personal injuries" in § 8–24 means only "physical injuries." It could be argued with at least equal force that the phrase "personal injuries" was designed to distinguish those causes of action involving torts against the person from those involving damage to property. And whether the damages claim of the Gonzaleses be properly characterized as involving "injured feelings and humiliation," as the Court of Appeals held, 515 F. 2d, at 1097, or the vindication of constitutional rights, as the petitioners contend, there is no dispute that the damage was to their persons, not to their realty or personalty. Cf. *Carva Food Corp.* v. *Dawley*, 202 Va. 543, 118 S. E. 2d 664; *Travelers Ins. Co.* v. *Turner*, 211 Va. 552, 178 S. E. 2d 503.

B. *Attorneys' Fees*

The District Court, without explanation or citation of authority, awarded attorneys' fees of $1,000 against each of the two schools. The Court of Appeals reversed this part of the District Court's judgment. Anticipating our decision in *Alyeska Pipeline Service Co.* v. *Wilderness Society*, 421 U. S. 240, the appellate court refused to adopt the so-called private attorney general theory under which attorneys' fees could be awarded to any litigant who vindicates an important public interest. And it could find no other ground for the award: no statute explicitly provides for attorneys' fees in § 1981 cases,[18] and neither

---

[18] Cf., *e. g.*, Title II of the Civil Rights Act of 1964, 42 U. S. C. § 2000a–3 (b). See *Alyeska Pipeline Serv. Co.* v. *Wilderness Society*, 421 U. S. 240, 260–262, and n. 33.

school had evinced " 'obstinate obduracy' " or bad faith in contesting the action. 515 F. 2d, at 1089–1090.

Mindful of this Court's *Alyeska* decision, the petitioners do not claim that their vindication of the right of Negro children to attend private schools alone entitles them to attorneys' fees. They make instead two other arguments.

First, the petitioners claim that the schools exhibited bad faith, not by litigating the legal merits of their racially discriminatory admissions policy, but by denying that they in fact had discriminated. To support this claim, the petitioners cite a number of conflicts in testimony between the McCrarys, the Gonzaleses, and other witnesses, on the one hand, and the officials of the schools, on the other, which the District Court resolved against the schools in finding racial discrimination. Indeed, the trial court characterized as "unbelievable" the testimony of three officials of the Fairfax-Brewster School. 363 F. Supp., at 1202. By stubbornly contesting the facts, the petitioners assert, the schools attempted to deceive the court and, in any event, needlessly prolonged the litigation.

We cannot accept this argument. To be sure, the Court has recognized the "inherent power" of the federal courts to assess attorneys' fees when the losing party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons . . . ." *F. D. Rich Co.* v. *United States ex rel. Industrial Lumber Co.,* 417 U. S. 116, 129. See *Alyeska, supra,* at 258–259; *Vaughan* v. *Atkinson,* 369 U. S. 527. But in this case the factual predicate to a finding of bad faith is absent. Simply because the facts were found against the schools does not by itself prove that threshold of irresponsible conduct for which a penalty assessment would be justified. Whenever the facts in a case are disputed, a court perforce must decide that one party's version is inaccurate. Yet it would be

untenable *to* conclude *ipso facto* that that party had
acted in bad faith. As the Court of Appeals stated, 515
F. 2d, at 1090: "Faults in perception or memory often
account for differing trial testimony, but that has not yet
been thought a sufficient ground to shift the expense of
litigation." We find no warrant for disturbing the hold-
ing of the Court of Appeals that no bad faith permeated
the defense by the schools of this lawsuit.

The petitioners' second argument is that while 42
U. S. C. § 1981 contains no authorization for the award
of attorneys' fees, 42 U. S. C. § 1988 implicitly does. In
relevant part, that section reads:

> "The jurisdiction in civil . . . matters conferred on
> the district courts by the provisions of this chap-
> ter and Title 18, for the protection of all persons in
> the United States in their civil rights, and for their
> vindication, shall be exercised and enforced in con-
> formity with the laws of the United States, so far
> as such laws are suitable to carry the same into
> effect; but in all cases where they are not adapted
> to the object, or are deficient in the provisions nec-
> essary to furnish suitable remedies and punish
> offenses against law, the common law, as modified
> and changed by the constitution and statutes of the
> State wherein the court having jurisdiction of such
> civil or criminal cause is held, so far as the same is
> not inconsistent with the Constitution and laws of
> the United States, shall be extended to and govern
> the said courts in the trial and disposition of the
> cause . . . ."

The petitioners assert, in the words of their brief, that
§ 1988 "embodies a uniquely broad commission to the
federal courts to search among federal and state statutes
and common law for the remedial devices and proce-
dures which best enforce the substantive provisions of

Sec. 1981 and other civil rights statutes." As part of that "broad commission" the federal courts are obligated, the petitioners say, to award attorneys' fees whenever such fees are needed to encourage private parties to seek relief against illegal discrimination.

This contention is without merit. It is true that in order to vindicate the rights conferred by the various Civil Rights Acts, § 1988 "authorize[s] federal courts, where federal law is unsuited or insufficient 'to furnish suitable remedies,' to look to principles of the common law, as altered by state law . . . ." *Moor* v. *County of Alameda*, 411 U. S. 693, 702–703. See *Sullivan* v. *Little Hunting Park, Inc.*, 396 U. S., at 239–240. But the Court has never interpreted § 1988 to warrant the award of attorneys' fees. And nothing in the legislative history of that statute suggests that such a radical departure from the long-established American rule forbidding the award of attorneys' fees was intended.

More fundamentally, the petitioners' theory would require us to overlook the penultimate clause of § 1988: "so far as the same is not inconsistent with the Constitution and laws of the United States." As the Court recounted in some detail in *Alyeska, supra,* at 247, *passim,* the law of the United States, but for a few well-recognized exceptions not present in these cases,[19] has always been that absent explicit congressional authorization, attorneys' fees are not a recoverable cost of litigation. Hence, in order to "furnish" an award of attorneys' fees, we would have to find that at least as to cases brought under statutes to which § 1988 applies, Congress intended

---

[19] See, *e. g., Trustees* v. *Greenough,* 105 U. S. 527 (allowance of attorneys' fees out of a common fund); *Toledo Scale Co.* v. *Computing Scale Co.,* 261 U. S. 399 (assessment of fees as part of the fine for willful disobedience of a court order); *F. D. Rich Co.* v. *United States ex rel. Industrial Lumber Co.,* 417 U. S. 116 (assessment of attorneys' fees against party acting in bad faith).

to set aside this longstanding American rule of law. We are unable to conclude, however, from the generalized commands of § 1988, that Congress intended any such result.

For the reasons stated in this opinion, the judgment of the Court of Appeals is in all respects affirmed.

*It is so ordered.*

MR. JUSTICE POWELL, concurring.

If the slate were clean I might well be inclined to agree with MR. JUSTICE WHITE that § 1981 was not intended to restrict private contractual choices. Much of the review of the history and purpose of this statute set forth in his dissenting opinion is quite persuasive. It seems to me, however, that it comes too late.

The applicability of § 1981 to private contracts has been considered maturely and recently, and I do not feel free to disregard these precedents.* As they are reviewed in the Court's opinion, I merely cite them: *Johnson* v. *Railway Express Agency*, 421 U. S. 454, 459–460 (1975), an opinion in which I joined; *Tillman* v. *Wheaton-Haven Recreation Assn.*, 410 U. S. 431, 439–440 (1973), another opinion in which I joined; *Sullivan* v. *Little Hunting Park, Inc.*, 396 U. S. 229, 236–237 (1969) ; and particularly and primarily, *Jones* v. *Alfred H. Mayer*

---

*In some instances the Court has drifted almost accidentally into rather extreme interpretations of the post-Civil War Acts. The most striking example is the proposition, now often accepted uncritically, that 42 U. S. C. § 1983 does not require exhaustion of administrative remedies under any circumstances. This far-reaching conclusion was arrived at largely without the benefit of briefing and argument. See, *e. g.*, *Wilwording* v. *Swenson*, 404 U. S. 249 (1971) ; *Houghton* v. *Shafer*, 392 U. S. 639 (1968) ; *Damico* v. *California*, 389 U. S. 416 (1967). I consider the posture of §§ 1981 and 1982 in the jurisprudence of this Court to be quite different from that of § 1983.

*Co.,* 392 U. S. 409, 420–437 (1968). Although the latter two cases involved § 1982, rather than § 1981, I agree that their considered holdings with respect to the purpose and meaning of § 1982 necessarily apply to both statutes in view of their common derivation.

Although the range of consequences suggested by the dissenting opinion, *post,* at 212, goes far beyond what we hold today, I am concerned that our decision not be construed more broadly than would be justified.

By its terms § 1981 necessarily imposes some restrictions on those who would refuse to extend to Negroes "the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." But our holding that this restriction extends to certain actions by private individuals does not imply the intrusive investigation into the motives of every refusal to contract by a private citizen that is suggested by the dissent. As the Court of Appeals suggested, some contracts are so personal "as to have a discernible rule of exclusivity which is inoffensive to § 1981." 515 F. 2d 1082, 1088 (1975).

In *Sullivan* v. *Little Hunting Park, supra,* we were faced with an association in which "[t]here was no plan or purpose of exclusiveness." Participation was "open to every white person within the geographic area, there being no selective element other than race." 396 U. S., at 236. See also *Tillman* v. *Wheaton-Haven Recreation Assn., supra,* at 438. In certain personal contractual relationships, however, such as those where the offeror selects those with whom he desires to bargain on an individualized basis, or where the contract is the foundation of a close association (such as, for example, that between an employer and a private tutor, babysitter, or housekeeper), there is reason to assume that, although the choice made by the offeror is selective, it reflects "a purpose of exclusiveness" other than the desire to bar

members of the Negro race. Such a purpose, certainly in most cases, would invoke associational rights long respected.

The case presented on the record before us does not involve this type of personal contractual relationship. As the Court of Appeals said, the petitioning "schools are private only in the sense that they are managed by private persons and they are not direct recipients of public funds. Their actual and potential constituency, however, is more public than private." 515 F. 2d, at 1089. The schools extended a public offer open, on its face, to any child meeting certain minimum qualifications who chose to accept. They advertised in the "Yellow Pages" of the telephone directories and engaged extensively in general mail solicitations to attract students. The schools are operated strictly on a commercial basis, and one fairly could construe their open-end invitations as offers that matured into binding contracts when accepted by those who met the academic, financial, and other racially neutral specified conditions as to qualifications for entrance. There is no reason to assume that the schools had any special reason for exercising an option of personal choice among those who responded to their public offers. A small kindergarten or music class, operated on the basis of personal invitations extended to a limited number of preidentified students, for example, would present a far different case.

I do not suggest that a "bright line" can be drawn that easily separates the type of contract offer within the reach of § 1981 from the type without. The case before us is clearly on one side of the line, however defined, and the kindergarten and music school examples are clearly on the other side. Close questions undoubtedly will arise in the gray area that necessarily exists in between. But some of the applicable principles and considerations, for the most part identified by the Court's opinion, are

clear: § 1981, as interpreted by our prior decisions, does reach certain acts of racial discrimination that are "private" in the sense that they involve no *state* action. But choices, including those involved in entering into a contract, that are "private" in the sense that they are not part of a commercial relationship offered generally or widely, and that reflect the selectivity exercised by an individual entering into a personal relationship, certainly were never intended to be restricted by the 19th century Civil Rights Acts. The open offer to the public generally involved in the cases before us is simply not a "private" contract in this sense. Accordingly, I join the opinion of the Court.

MR. JUSTICE STEVENS, concurring.

For me the problem in these cases is whether to follow a line of authority which I firmly believe to have been incorrectly decided.

*Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409, and its progeny have unequivocally held that § 1 of the Civil Rights Act of 1866 prohibits private racial discrimination. There is no doubt in my mind that that construction of the statute would have amazed the legislators who voted for it. Both its language and the historical setting in which it was enacted convince me that Congress intended only to guarantee all citizens the same legal capacity to make and enforce contracts, to obtain, own, and convey property, and to litigate and give evidence. Moreover, since the legislative history discloses an intent not to outlaw segregated public schools at that time,[1] it is quite unrealistic to assume that Congress in-

---

[1] The sponsor of the bill in the House, Representative Wilson of Iowa, disclaimed any effect of the bill upon segregated schools. Cong. Globe, 39th Cong., 1st Sess., 1117, 1294 (1866). Opponents of the bill raised this point as an objection to a provision in the bill that "there shall be no discrimination in civil rights or immunities among

tended the broader result of prohibiting segregated private schools. Were we writing on a clean slate, I would therefore vote to reverse.

But *Jones* has been decided and is now an important part of the fabric of our law. Although I recognize the force of MR. JUSTICE WHITE's argument that the construction of § 1982 does not control § 1981, it would be most incongruous to give those two sections a fundamentally different construction. The net result of the enactment in 1866, the re-enactment in 1870, and the codification in 1874 produced, I believe, a statute resting on the constitutional foundations provided by both the Thirteenth and Fourteenth Amendments. An attempt to give a fundamentally different meaning to two similar provisions by ascribing one to the Thirteenth and the other to the Fourteenth Amendment cannot succeed. I am persuaded, therefore, that we must either apply the rationale of *Jones* or overrule that decision.

There are two reasons which favor overruling. First, as I have already stated, my conviction that *Jones* was wrongly decided is firm. Second, it is extremely unlikely that reliance upon *Jones* has been so extensive that this Court is foreclosed from overruling it. Cf. *Flood* v. *Kuhn,* 407 U. S. 258, 273–274, 278–279, 283. There are, however, opposing arguments of greater force.

The first is the interest in stability and orderly development of the law. As Mr. Justice Cardozo remarked, with respect to the routine work of the judiciary: "The labor of judges would be increased almost to the breaking

---

the citizens of the United States in any State or Territory of the United States on account of race, color, or previous condition of slavery . . . ." *Id.,* at 1122 (remarks of Rep. Rogers); *id.,* at 1268 (remarks of Rep. Kerr); *id.,* at 1271–1272 (remarks of Rep. Bingham); see *id.,* at 500 (remarks of Sen. Cowan). The provision was deleted in part for this reason. See *id.,* at 1366 (remarks of Rep. Wilson). In that form the bill was enacted into law.

point if every past decision could be reopened in every case, and one could not lay one's own course of bricks on the secure foundation of the courses laid by others who had gone before him." [2]   Turning to the exceptional case, Mr. Justice Cardozo noted: "[W]hen a rule, after it has been duly tested by experience, has been found to be inconsistent with the sense of justice or with the social welfare, there should be less hesitation in frank avowal and full abandonment. . . .   If judges have woefully misinterpreted the *mores* of their day, or if the *mores* of their day are no longer those of ours, they ought not to tie, in helpless submission, the hands of their successors." [3]   In this case, those admonitions favor adherence to, rather than departure from, precedent.   For even if *Jones* did not accurately reflect the sentiments of the Reconstruction Congress, it surely accords with the prevailing sense of justice today.

The policy of the Nation as formulated by the Congress in recent years has moved constantly in the direction of eliminating racial segregation in all sectors of society. [4] This Court has given a sympathetic and liberal construction to such legislation. [5]   For the Court now to overrule *Jones* would be a significant step backwards, with effects that would not have arisen from a correct decision in the first instance.   Such a step would be so

---

[2] B. Cardozo, The Nature of the Judicial Process 149 (1921).

[3] *Id.*, at 150–152.

[4] See, *e. g.*, the Civil Rights Act of 1964, 78 Stat. 241, as added and as amended, 28 U. S. C. § 1447 (d), 42 U. S. C. §§ 1971, 1975a–1975d, 2000a—2000h–6 (1970 ed. and Supp. IV); the Voting Rights Act of 1965, 79 Stat. 437, as added and as amended, 42 U. S. C. §§ 1973–1973bb–4; the Civil Rights Act of 1968, Titles VIII, IX, 82 Stat. 81, 89, as amended, 42 U. S. C. §§ 3601–3631 (1970 ed. and Supp. IV).

[5] See, *e. g.*, *Trafficante* v. *Metropolitan Life Ins. Co.*, 409 U. S. 205; *Griggs* v. *Duke Power Co.*, 401 U. S. 424; *Daniel* v. *Paul*, 395 U. S. 298; *Allen* v. *State Board of Elections*, 393 U. S. 544.

clearly contrary to my understanding of the mores of today that I think the Court is entirely correct in adhering to *Jones*.

With this explanation, I join the opinion of the Court.

MR. JUSTICE WHITE, with whom MR. JUSTICE REHNQUIST joins, dissenting.

We are urged here to extend the meaning and reach of 42 U. S. C. § 1981 so as to establish a general prohibition against a private individual's or institution's refusing to enter into a contract with another person because of that person's race. Section 1981 has been on the books since 1870 and to so hold for the first time [1] would be contrary to the language of the section, to its legislative history, and to the clear dictum of this Court in the *Civil Rights Cases,* 109 U. S. 3, 16–17 (1883), almost contemporaneously with the passage of the statute, that the section reaches only discriminations imposed by state law. The majority's belated discovery of a congressional purpose which escaped this Court only a decade after the statute was passed and which escaped all other federal courts for almost 100 years is singularly unpersuasive.[2] I therefore respectfully dissent.

---

[1] The majority and two concurring Justices assert that this Court has already considered the issue in this litigation and resolved it in favor of a right of action for private racially motivated refusals to contract. They are wrong. As is set forth more fully below, the only time the issue has been previously addressed by this Court it was addressed in a case in which the Court had issued a limited grant of certiorari, not including the issue involved here; in which the issue involved here was irrelevant to the decision; and in which the parties had not briefed the issue and the Court had not canvassed the relevant legislative history.

[2] I do not question at this point the power of Congress or a state legislature to ban racial discrimination in private school admissions decisions. But as I see it Congress has not yet chosen to exercise that power.

I

Title 42 U. S. C. § 1981, captioned "Equal rights under the law," [3] provides in pertinent part:

> "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ."

On its face the statute gives "[a]ll persons" (plainly including Negroes) the *same right . . . to make . . . contracts . . . as is enjoyed by white citizens."* (Emphasis added.) The words "right . . . enjoyed by white citizens" clearly refer to rights existing apart from this

---

[3] Title 42 U. S. C. § 1981 provides in full:

"§ 1981. *Equal rights under the law.*

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

The title to § 1981 was placed there originally by the Revisers who compiled the Revised Statutes of 1874. They did so under a statute defining their responsibilities in part, as follows: to "arrange the [statutes] under titles, chapters, and sections, or other suitable divisions and subdivisions with *head-notes briefly expressive of the matter contained in such divisions."* 14 Stat. 75. (Emphasis added.) The headnote to what is now § 1981 was before Congress when it enacted the Revised Statutes into positive law. It may properly be considered as an aid to construction, if the statutory language is deemed unclear. *E. g., Patterson* v. *Bark Eudora,* 190 U. S. 169, 172 (1903); *FTC* v. *Mandel Bros.,* 359 U. S. 385, 389 (1959); *Knowlton* v. *Moore,* 178 U. S. 41, 65 (1900); *Maguire* v. *Commissioner,* 313 U. S. 1, 9 (1941).

statute. Whites had at the time when § 1981 was first
enacted, and have (with a few exceptions mentioned
below), no right to make a contract with an unwilling
private person, no matter what that person's motivation
for refusing to contract. Indeed it is and always has
been central to the very concept of a "contract" that
there be "assent by the parties who form the contract
to the terms thereof," Restatement of Contracts § 19 (b)
(1932); see also 1 S. Williston, Law of Contracts § 18 (3)
(3d ed., 1957). The right to make contracts, enjoyed by
white citizens, was therefore always a right to enter into
binding agreements only with willing second parties.
Since the statute only gives Negroes the "same rights" to
contract as is enjoyed by whites, the language of the stat-
ute confers no right on Negroes to enter into a contract
with an unwilling person no matter what that person's
motivation for refusing to contract. What is conferred
by 42 U. S. C. § 1981 is the *right*—which was enjoyed by
whites—"to make contracts" with other willing parties
and to "enforce" those contracts in court. Section 1981
would thus invalidate any state statute or court-made
rule of law which would have the effect of disabling
Negroes or any other class of persons from making con-
tracts or enforcing contractual obligations or otherwise
giving less weight to their obligations than is given to
contractual obligations running to whites.[4] The statute
by its terms does not require any private individual or
institution to enter into a contract or perform any other
act under any circumstances; and it consequently fails to
supply a cause of action by respondent students against

---

[4] The statute also removes any state-law-created legal disabilities
enacted by the Southern States—see E. McPherson, The Political His-
tory of the United States of America During the Period of Recon-
struction 29, 33, 35 (1871)—preventing Negroes or any other class
of persons from suing, being parties, and giving evidence; and pro-
vides that all persons shall have full and equal benefit of all laws.

petitioner schools based on the latter's racially motivated decision not to contract with them.[5]

## II

The legislative history of 42 U. S. C. § 1981 confirms that the statute means what it says and no more, *i. e.*, that it outlaws any legal rule disabling any person from making or enforcing a contract, but does not prohibit private racially motivated refusals to contract. Title 42 U. S. C. § 1981 is § 1977 of the Revised Statutes of 1874, which itself was taken verbatim from § 16 of the Voting Rights Act of May 31, 1870, 16 Stat. 144.[6]  The legisla-

---

[5] One of the major issues in this case plainly is whether the construction in *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409 (1968), placed on similar language contained in 42 U. S. C. § 1982 granting all citizens the "same rights to . . . purchase . . . real . . . property" as is enjoyed by white citizens prevents this Court from independently construing the language in 42 U. S. C. § 1981.  As will be developed more fully below, *Jones* v. *Alfred H. Mayer Co.* does not so constrict this Court.  First, the legislative history of § 1981 is very different from the legislative history of § 1982 so heavily relied on by the Court in *Jones* v. *Alfred H. Mayer Co.*  Second, notwithstanding the dictum in *Jones* v. *Alfred H. Mayer Co.*, quoted by the majority, *ante*, at 170, even the majority does not contend that the grant of the other rights enumerated in § 1981, *i. e.*, the rights "to sue, be parties, give evidence," and *"enforce* contracts" accomplishes anything other than the removal of *legal* disabilities to sue, be a party, testify or enforce a contract.  Indeed it is impossible to give such language any other meaning.  Thus, even accepting the *Jones* v. *Alfred H. Mayer Co.* dictum as applicable to § 1981, the question still would remain whether the right to "make contracts" is to be construed in the same vein as the other "right[s]" included in § 1981 or rather in the same vein as the right to "purchase . . . real property" under § 1982 involved in *Jones* v. *Alfred H. Mayer Co., supra.*

[6] Section 16 of the Voting Rights Act of 1870 provided:

"And be it further enacted, That *all persons within the jurisdiction of the United States shall have the same right in every State and Territory in the United States to make and enforce con-*

tive process culminating in the enactment of § 16 of the Voting Rights Act of 1870 was initiated by the following resolution proposed by Senator Stewart of Nevada, a

---

*tracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and* none other, any law, statute, ordinance, regulation, or custom to the contrary notwithstanding. No tax or charge shall be imposed or enforced by any State upon any person immigrating thereto from a foreign country which is not equally imposed and enforced upon every person immigrating to such State from any other foreign country; and any law of any State in conflict with this provision is hereby declared null and void." (Emphasis added.)

As may be seen, the italicized portion is § 1981.

The majority mistakenly asserts that § 1977 of the Revised Statutes of 1874—the present § 1981—is taken from § 1 of the Civil Rights Act of 1866, 14 Stat. 27, which was re-enacted as § *18* of the Voting Rights Act of 1870 and which provided:

"That all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and *such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other,* any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding." (Emphasis added.)

While the italicized portion of § 1 of the Civil Rights Act of 1866 is *similar* to § 1981 it is not the same statute. First, the 1866 statute, passed under the Thirteenth Amendment and before adoption of the Fourteenth Amendment, applies to *"citizens,* of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted"; whereas § 1981, like § 16 of

member of the Judiciary Committee, and eventual floor manager of the Voting Rights Act, and unanimously agreed to by the Senate on December 6, 1869.

> "*Resolved,* That the Committee on the Judiciary be requested to inquire if any States are denying to any class of persons within their jurisdiction the *equal protection of the law,* in violation of treaty obligations with foreign nations and of *section one of the fourteenth amendment to the Constitution;* and if so, *what legislation is necessary to enforce* such treaty obligations and *such amendment,* and to report by bill or otherwise." Cong. Globe, 41st Cong., 2d Sess. 3 (1869). (Emphasis added.)

This resolution bore fruit in a bill (S. 365),[7] which

----

the Voting Rights Act of 1870, applies to "all persons"—including noncitizens. Second, the 1866 statute does not provide express protection against "taxes, licenses and exactions of every kind." Section 1981, like § 16 of the Voting Rights Act of 1870, does. Third, the Revisers' notes to the 1874 Revision—which notes were before Congress when it enacted the Revised Statutes into positive law— clearly designate § 16 of the Voting Rights Act of 1870 as the source for § 1977—the current 42 U. S. C. § 1981.

I deal *infra* with the majority's equally untenable position that § 1981 is in fact derived *both* from § 16 of the Voting Rights Act *and* § 1 of the Civil Rights Act of 1866.

[7] S. 365 provided in pertinent part:

"*Be it enacted, &c.,* That all persons within the jurisdiction of the United States, Indians not taxed excepted, shall have the same right in every State and Territory in the United States to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens, and shall be subject to like punishments, pains, penalties, taxes, licenses, and exactions of every kind and none other, any law, statute, ordinance, regulation, or custom to the contrary notwithstanding. No tax or charge shall be imposed or enforced by any State upon any person emigrating thereto from a foreign country which is not equally imposed and enforced upon every person emigrating to such State from any other

198

was first referred to in the Congressional Globe on January 10, 1870. On that day Senator Stewart "asked and by unanimous consent obtained, leave to introduce a bill (S. 365) to secure to *all persons the equal protection of the laws*." (Emphasis added.) Cong. Globe, 41st Cong., 2d Sess., 323. The bill was then referred to the Judiciary Committee. The next reference to the bill in the Congressional Globe is on February 2, 1870. It states: "Mr. TRUMBULL, from the Committee on the Judiciary, to whom was referred the bill (S. No. 365) to secure to *all persons the equal protection of the laws* reported it with an amendment." *Id.*, at 964. (Emphasis added.) The next reference to the bill is on February 24, 1870. It states:

> "MR. STEWART. I move that the Senate proceed to the consideration of bill (S. No. 365) to secure to *all persons equal protection of the laws.* I do not think it will take more than a moment to pass that bill.
>
> "MR. HAMILTON. I desire that that bill be read." *Id.*, at 1536. (Emphasis added.)

The bill is next mentioned in the following colloquy later on the same day:

> "MR. POMEROY. I have not examined this bill, and I desire to ask the Senator from Nevada a question. I understood him to say that this bill gave the same civil rights to all persons in the United States which are enjoyed by citizens of the United States. Is that it?
>
> "MR. STEWART. *No; it gives all the protection of the laws.* If the Senator will examine this bill in connection with the original civil rights bill,[8] he

foreign country, and any law of any State in conflict with this provision is hereby declared null and void."

[8] This would appear to be a reference to § 1 of the Civil Rights

will see that it has no reference to inheriting or holding real estate.

"MR. POMEROY. That is what I was coming to.

"MR. STEWART. The civil rights bill had several other things applying to citizens of the United States. This simply extends to foreigners, not citizens, the protection of our laws where the *State laws* deny them the equal civil rights enumerated in the first section." *Ibid.* (Emphasis added.)

Consideration of the bill was then postponed.

The next reference to the bill was on March 4, 1870. It states:

"MR. STEWART. I move that the Senate proceed to the consideration of Senate bill No. 365, to secure to *all persons the equal protection of the laws.*" *Id.*, at 1678. (Emphasis added.)

Consideration of the bill was again postponed.

Then on May 18, 1870, Senator Stewart introduced S. 810 dealing with voting rights but including a section virtually identical to that in S. 365. *Id.*, at 3562. On May 20, 1870, Senator Stewart explained the relevant provision of S. 810, as follows:

"Then the other provision which has been added is one of great importance. It is of more importance to the honor of this nation than all the rest of this bill. We are inviting to our shores, or allowing them to come, Asiatics. We have got a treaty allowing them to come. . . . While they are here I say it is our duty to protect them. I have incorporated that provision in this bill on the advice of the Judiciary Committee, to facilitate matters and so

---

Act of 1866 which was construed in *Jones* v. *Alfred H. Mayer Co.*, 392 U. S. 409 (1968).

that we shall have the whole subject before us in one discussion. It is as solemn a duty as can be devolved upon this Congress to see that those people are protected, *to see that they have the equal protection of the laws, notwithstanding that they are aliens.* They, or any other aliens, who may come here are entitled to that protection. *If the State courts do not give them the equal protection of the law,* if public sentiment is so inhuman as to rob them of their ordinary civil rights, I say I would be less than man if I did not insist, and I do here insist that that provision shall go on this bill; and that the pledge of this nation shall be redeemed, that we will protect Chinese aliens or any other aliens whom we allow to come here, and give them a hearing in our courts; *let them sue and be sued; let them be protected by all the laws and the same laws that other men are. That is all there is in that provision.*

"Why is not this bill a good place in which to put that provision? Why should we not put in this bill a measure to enforce both the *fourteenth* and fifteenth *amendments* at once? . . . *The fourteenth amendment to the Constitution says that no State shall deny to any person the equal protection of the laws.* Your treaty says that they shall have the equal protection of the laws. Justice and humanity and common decency require it. I hope that provision will not be left off this bill, for there is no time to take it up as a separate measure, discuss it, and pass it at this session." *Id.,* at 3658. (Emphasis added.)

The only other reference which research uncovers to the relevant provision of S. 810 is on May 25, 1870, and consists of a speech by Senator Stewart emphasizing the need to protect Chinese aliens. *Id.,* at 3807–3808. The

voting rights bill was enacted into law on May 31, 1870, with the section providing for equal protection of the laws included as § 16.[9]

Three things emerge unmistakably from this legislative history. First, unlike § 1 of the Civil Rights Act

---

[9] Section 16, 16 Stat. 144, provided, as follows:

*"And be it further enacted,* That all persons within the jurisdiction of the United States shall have the same right in every State and Territory in the United States to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and none other, any law, statute, ordinance, regulation, or custom to the contrary notwithstanding. No tax or charge shall be imposed or enforced by any State upon any person immigrating thereto from a foreign country which is not equally imposed and enforced upon every person immigrating to such State from any other foreign country; and any law of any State in conflict with this provision is hereby declared null and void."

The Voting Rights Act also contained the following sections dealing with civil rights:

"SEC. 17. *And be it further enacted,* That any person who, under color of any law, statute, ordinance, regulation, or custom, shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any right secured or protected by the last preceding section of this act, or to different punishment, pains, or penalties on account of such person being an alien, or by reason of his color or race, than is prescribed for the punishment of citizens, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by fine not exceeding one thousand dollars, or imprisonment not exceeding one year, or both, in the discretion of the court.

"SEC. 18. *And be it further enacted,* That the act to protect all persons in the United States in their civil rights, and furnish the means of their vindication, passed April nine, eighteen hundred and sixty-six, is hereby re-enacted; and sections sixteen and seventeen hereof shall be enforced according to the provisions of said Act." (This section re-enacted § 1 of the Civil Rights Act of 1866. See n. 4, *supra.*)

of 1866, which was passed under Congress' Thirteenth Amendment powers to remove from former slaves " 'badges and incidents of slavery,' " *Jones* v. *Alfred H. Mayer Co.,* 392 U. S. 409, 439 (1968), § 16 of the Voting Rights Act of 1870 was passed under Congress' Fourteenth Amendment powers to prevent the States from denying to "any person . . . equal protection of the laws." U. S. Const., Amdt. 14, § 1. Second, consistent with the scope of that Amendment, see, *e. g., Jackson* v. *Metropolitan Edison Co.,* 419 U. S. 345, 349 (1974); *Civil Rights Cases,* 109 U. S. 3 (1883), § 16 was designed to require "all persons" to be treated "the same" or "equally" under the *law* and was not designed to require equal treatment at the hands of private individuals. Third, one of the classes of persons for whose benefit the statute was intended was aliens—plainly not a class with respect to which Congress sought to remove badges and incidents of slavery—and not a class protected in any fashion by § 1 of the Civil Rights Act of 1866, since that Act applied only to "citizens."

This Court has so construed § 1977 of the Revised Statutes of 1874 on several occasions. The Court said in the *Civil Rights Cases, supra,* at 16–17:

> "That law, as re-enacted, after declaring that *all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind, and none other,* any law, statute, ordinance, regulation or custom to the contrary notwithstand-

ing,[10] proceeds to enact, that any person who, under color of any law, statute, ordinance, regulation or custom, shall subject, or cause to be subjected, any inhabitant of any State or Territory to the deprivation of any rights secured or protected by the preceding section (above quoted), or to different punishment, pains, or penalties, on account of such person being an alien, or by reason of his color or race, than is prescribed for the punishment of citizens, shall be deemed guilty of a misdemeanor, and subject to fine and imprisonment as specified in the act. *This law is clearly corrective in its character, intended to counteract and furnish redress against State laws and proceedings, and customs having the force of law, which sanction the wrongful acts specified.* . . . The Civil Rights Bill here referred to is analogous in its character to what a law would have been under the original Constitution, declaring that *the validity of contracts should not be impaired, and that if any person bound by a contract should refuse to comply with it, under color or pretense that it had been rendered void or invalid by a State law,* he should be liable to an action upon it in the courts of the United States, with the addition of a penalty for setting up such an unjust and unconstitutional defence." (Emphasis added.)

Similarly in *Yick Wo* v. *Hopkins,* 118 U. S. 356, 369 (1886), the Court said:

*"The Fourteenth Amendment to the Constitution is not confined to the protection of citizens.* It says: 'Nor shall any State deprive *any person* of life, liberty, or property without due process of law; nor

---

[10] As can be seen the Court is quoting what is now 42 U. S. C. § 1981.

deny to any person within its jurisdiction the equal protection of the laws.' These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws. *It is accordingly enacted by § 1977 of the Revised Statutes, that 'all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens* and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.' " (Emphasis added.)

See also *Gibson* v. *Mississippi,* 162 U. S. 565, 580 (1896); *McLaughlin* v. *Florida,* 379 U. S. 184, 192 (1964), each of which stands for the proposition that § 1981 was enacted pursuant to Congress' power under the Fourteenth Amendment to provide for equal protection of the laws to all persons.

Indeed, it would be remarkable if Congress had intended § 1981 to require private individuals to contract with all persons the same as they contract with white citizens. To so construe § 1981 would require that private citizens treat aliens the same as they treat white citizens. However, the Federal Government has for some time discriminated against aliens in its employment policies. As we said in *Espinoza* v. *Farah Mfg. Co.,* 414 U. S. 86, 91 (1973): "Suffice it to say that we cannot conclude Congress would at once continue the practice of requiring citizenship as a condition of Federal employ-

ment, and, at the same time, prevent private employers from doing likewise."

Thus the legislative history of § 1981 unequivocally confirms that Congress' purpose in enacting that statute was solely to grant to all persons equal capacity to contract as is enjoyed by whites and included no purpose to prevent private refusals to contract, however motivated.

## III

The majority seeks to avoid the construction of 42 U. S. C. § 1981 arrived at above by arguing that it (*i. e.,* § 1977 of the Revised Statutes of 1874) is a re-enactment *both* of § 16 of the Voting Rights Act of 1870—the Fourteenth Amendment statute—*and* of part of §1 of the Civil Rights Act of 1866—the Thirteenth Amendment statute.[11]   The majority argues from this that § 1981 does limit *private* contractual choices because Congress may, under its Thirteenth Amendment powers, proscribe certain kinds of private conduct thought to perpetuate " 'badges and incidents of slavery,' " *Jones* v. *Alfred H. Mayer Co.,* 392 U. S., at 439; and because this Court has already construed the language "[a]ll citizens of the United States shall have the same right . . . as is enjoyed by white citizens . . . to . . . *purchase . . . real . . . property*" (emphasis added), contained in the Thirteenth Amendment statute, to proscribe a refusal by a *private* individual to sell real estate to a Negro because of his race. *Id.,* at 420–437. The majority's position is untenable.

First of all, as noted above, § 1977 of the Revised Statutes was passed by Congress with the Revisers' unambiguous note before it that the section derived solely

---

[11] Hereinafter, I will refer to § 1 of the Civil Rights Act of 1866 as "the Thirteenth Amendment statute" and to § 16 of the Voting Rights Act of 1870 as "the Fourteenth Amendment statute."

from the Fourteenth Amendment statute, accompanied by the confirmatory sidenote "Equal rights under the law." Second and more importantly, the majority's argument is logically impossible, because it has the effect of construing the language *"the same rights to make . . . contracts . . . as is enjoyed by white citizens,"* contained in § 1977 of the Revised Statutes, to mean one thing with respect to one class of "persons" and another thing with respect to another class of "persons." If § 1981 is held to be a re-enactment of the Thirteenth Amendment statute aimed at private discrimination against "citizens" *and* the Fourteenth Amendment statute aimed at state-law-created legal disabilities for "all persons," including aliens, then one class of "persons"—Negro citizens— would, under the majority's theory, have a right not to be discriminated against by private individuals and another class—aliens—would be given *by the same language* no such right. The statute draws no such distinction among classes of persons. It logically must be construed either to give "all persons" a right not to be discriminated against by private parties in the making of contracts or to give no persons such a right. Aliens clearly never had such a right under the Fourteenth Amendment statute (or any other statute); § 1977 is concededly derived solely from the Fourteenth Amendment statute so far as coverage of aliens is concerned; and there is absolutely no indication that aliens' rights were expanded by the re-enactment of the Fourteenth Amendment statute in § 1977 of the Revised Statutes of 1874. Accordingly, the statute gives *no* class of persons the right not to be discriminated against by private parties in the making of contracts.

That part of the Thirteenth Amendment statute which gives "[a]ll citizens . . . the same rights to make . . . contracts . . . as is enjoyed by white citizens" was accordingly, not re-enacted as part of § 1977, and, since another

portion of the Thirteenth Amendment statute *was* re-enacted as § 1978 of the Revised Statutes,[12] the "right to contract" part of the Thirteenth Amendment statute was repealed in 1874, by § 5596 of the Revised Statutes which provides in part as follows:

> "All acts of Congress passed prior to said first day of December one thousand eight hundred and seventy-three, any portion of which is embraced in any section of said revision, are hereby repealed, and the section applicable thereto shall be in force in lieu thereof."

The majority's final argument is that to construe the enactment of the Revised Statutes of 1874 to have repealed that part of the Thirteenth Amendment statute which gave "citizens . . . the same rights to make . . . contracts . . . as is enjoyed by white citizens" is to conclude that a substantive change in the law was wrought by the revision; and that this is contrary to normal canons of construction and contrary to the instructions given to the Revisers in the statute creating their jobs and defining their duties.

First of all, the argument is beside the point. Congress, not the Revisers, repealed part of the Thirteenth Amendment statute by enacting § 5596 quoted above. The repeal is clear and unambiguous, and the reasons for the repeal, if any, are beyond our powers to question.

As we said of the 1874 revision in *United States* v. *Bowen,* 100 U. S. 508, 513 (1880):

> "The Revised Statutes must be treated as the legis-

---

[12] Section 1978 of the Revised Statutes is 42 U. S. C. § 1982 and it provides as follows:

"All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property."

lative declaration of the statute law on the subjects which they embrace on the first day of December, 1873. When the meaning is plain, the courts cannot look to the statutes which have been revised to see if Congress erred in that revision . . . ."

In *Bate Refrigerating Co.* v. *Sulzberger,* 157 U. S. 1, 41 (1895), we said:

"Now, it is true that, according to the report in the Congressional Globe of the proceedings in the House of Representatives . . . the report of the revisers had been examined by the House Committee on Revision of the Laws of the United States, and 'found to embody all the provisions of existing law, in brief, clear and precise language. . . .'

"These considerations, it is supposed, should have controlling weight in our interpretation of the act as it finally passed. We cannot assent to this view. . . . [W]hatever may have been the scope of the act of 1866 [providing for compilation of a revised code] the purpose, in the act [in question] to go beyond revision and to amend the existing statutes, is manifest from the title of that act, and from the bill that came from the House Committee on Patents. . . ."

Similarly, here, we are bound by what Congress actually did regardless of its reasons, if any.

Second, the majority's argument may well rest on a false assumption that the repeal of part of the Thirteenth Amendment statute changed the law.[13] The re-

_____

[13] I dissented in *Jones* v. *Alfred H. Mayer Co.,* 392 U. S. 409 (1968), on the ground that Congress did not ever intend any of the rights granted in the Thirteenth Amendment statute—including the right to buy real property—to accomplish more than the removal of legal disabilities. Under that view the conduct of the Revisers and of Congress in 1874 makes perfect sense—there

pealed portion [14] of the Thirteenth Amendment statute may well never have had any effect other than that of removing certain legal disabilities. First, as noted above, some of the rights granted under the Thirteenth Amendment statute—the rights to sue, be parties, give evidence, enforce contracts—could not possibly accomplish anything other than the removal of *legal* disabilities. Thus, the question is whether the right to "make contracts" in the repealed part of the Thirteenth Amendment statute would have been construed in the same vein as these other rights (later included in the Fourteenth Amendment statute) or rather in the same vein as the right to "purchase, etc., real and personal property." The fact that one of the leaders of the efforts to pass the Thirteenth Amendment statute—Senator Stewart—included the right to "make contracts" but not the right to "purchase, etc., real and personal prop-

---

were two statutes accomplishing the same thing, one with respect to "all persons," and the other with respect to the included category of "citizens." Under this view which I still believe was shared by Congress and the Revisers, the statute applicable to the included category "citizens" was redundant and was quite sensibly repealed. I am bound by the holding in *Jones* v. *Alfred H. Mayer Co.*, *supra*, that—with respect to the right to "purchase . . . real . . . property"—the Thirteenth Amendment statute accomplishes more than the removal of legal disabilities. However, for the reasons set forth below, it does not follow that the right to "make . . . contracts" in the Thirteenth Amendment statute ever granted anything more than the right to be free from legal disabilities to contract. Accordingly, the Revisers and Congress may well, by repealing part of the Thirteenth Amendment statute, have simply eliminated redundant legislation.

[14] The repealed portion is set forth below:

"[C]itizens . . . shall have the same right, in every State and Territory in the United States, *to make and enforce contracts, to sue, be parties, and give evidence . . . and to full and equal benefit of all laws and proceedings* for the security of person and property, as is enjoyed by white citizens . . . ." (Emphasis added.)

erty" in the Fourteenth Amendment statute providing for equal rights under the laws which he sponsored four years later is strong evidence of the fact that Congress always viewed the right to "make contracts" as simply granting equal legal capacity to contract. Plainly that is the only effect of such language in the Fourteenth Amendment statute. It is reasonable to suppose Congress intended the identical language to accomplish the same result when included in a different statute four years earlier. Indeed Senator Stewart specifically drew a distinction between the rights enumerated in the Fourteenth Amendment statute. including the right to "make contracts" and the real and personal property rights not so included. In connection with the Fourteenth Amendment statute, he was asked:

> "MR. POMEROY. I have not examined this bill, and I desire to ask the Senator from Nevada a question. I understood him to say that this bill gave the same civil rights to all persons in the United States which are enjoyed by citizens of the United States. Is that it?"

He replied:

> "MR. STEWART. *No; it gives all the protection of the laws.* If the Senator will examine this bill in connection with the original civil rights bill, he will see that it has no reference to inheriting or holding real estate."

Similarly, President Johnson in vetoing the Thirteenth Amendment statute differentiated between real property rights and contract rights granted by that statute. He said: "If Congress can declare by law who shall hold lands, who shall testify, who shall have *capacity* to make a contract in a State, then Congress can by law also declare who, without regard to color or race, shall have

the right to sit as juror or as a judge, to hold any office, and, finally, to vote, 'in every State and Territory of the United States.' " Cong. Globe, 39th Cong., 1st Sess., 1680 (1866). (Emphasis added.) Moreover, the legislative history of the Thirteenth Amendment statute is laced with statements that it does not require Negroes and whites to be sent to the same schools—statements which are inconsistent with a provision banning all racially motivated contractual decisions.[15]

Finally, as a matter of common sense, it would seem extremely unlikely that Congress would have intended—without a word in the legislative history addressed to the precise issue—to pass a statute prohibiting every racially motivated refusal to contract by a private individual. It is doubtful that all such refusals could be considered badges or incidents of slavery within Congress' proscriptive power under the Thirteenth Amendment. A racially motivated refusal to hire a Negro or a white babysitter or to admit a Negro or a white to a private association cannot be called a badge of slavery—and yet the construction given by the majority to the Thirteenth Amendment statute attributes to Congress an intent to proscribe them.

The Court holds in *McDonald* v. *Santa Fe Trail Transp. Co., post,* p. 273, that § 1981 gives to whites the same cause of action it gives to blacks. Thus under the majority's construction of § 1981 in this case a former slaveowner was given a cause of action against his former slave if the former slave refused to work for him on the ground that he was a white man. It is inconceivable that Congress ever intended such a result.

---

[15] See remarks of Senator Cowan, Cong. Globe, 39th Cong., 1st Sess., 500 (1866); remarks of Representative Wilson, *id.,* at 1117; remarks of Representative Rogers, *id.,* at 1120–1123.

## IV

The majority's holding that 42 U. S. C. § 1981 prohibits all racially motivated contractual decisions—particularly coupled with the Court's decision in *McDonald, supra,* that whites have a cause of action against others including blacks for racially motivated refusals to contract—threatens to embark the Judiciary on a treacherous course. Whether such conduct should be condoned or not, whites and blacks will undoubtedly choose to form a variety of associational relationships pursuant to contracts which exclude members of the other race. Social clubs, black and white, and associations designed to further the interests of blacks or whites are but two examples. Lawsuits by members of the other race attempting to gain admittance to such an association are not pleasant to contemplate. As the associational or contractual relationships become more private, the pressures to hold § 1981 inapplicable to them will increase. Imaginative judicial construction of the word "contract" is foreseeable; Thirteenth Amendment limitations on Congress' power to ban "badges and incidents of slavery" may be discovered; the doctrine of the right to association may be bent to cover a given situation. In any event, courts will be called upon to balance sensitive policy considerations against each other—considerations which have never been addressed by any Congress—all under the guise of "construing" a statute. This is a task appropriate for the Legislature, not for the Judiciary.

Such balancing of considerations as has been done by Congress in the area of racially motivated decisions not to contract with a member of the other race has led it to ban private racial discrimination in most of the job market and most of the housing market and to go no further. The Judiciary should not undertake the political task of trying to decide what other areas are appropriate ones for a similar rule.

## V

There remains only the question whether any prior pronouncements of this Court preclude me from construing 42 U. S. C. § 1981 in the manner indicated above. What has already been said demonstrates that this Court's construction of § 1982 in *Jones* v. *Alfred H. Mayer Co.,* 392 U. S. 409 (1968), does not require me to construe § 1981 in a similar manner. The former is a Thirteenth Amendment statute under which the Congress may and did seek to reach private conduct, at least with respect to sales of real estate. The latter is a Fourteenth Amendment statute under which the Congress may and did reach only state action.

However, the majority points to language in *Johnson* v. *Railway Express Agency,* 421 U. S. 454 (1975), stating with no discussion whatever that § 1981 supplies a cause of action for a private racially motivated refusal to contract. In *Johnson,* the respondent had been sued for firing the petitioner on account of his race. The Court of Appeals held the petitioner's action under § 1981 to have been barred by the applicable statute of limitations. We granted petitioner's petition for a writ of certiorari limited to the question

> " '[w]hether the timely filing of a charge of employment discrimination with the Equal Employment Opportunity Commission pursuant to Section 706 of Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e–5, tolls the running of the period of limitation applicable to an action based on the same facts brought under the Civil Rights Act of 1866, 42 U. S. C. § 1981?' " 417 U. S. 929 (1974).

Respondent could have argued in support of the judgment of the Court of Appeals that § 1981 supplied no cause of action quite apart from the statute of limitations, see *United States* v. *American Railway Express*

*Co.*, 265 U. S. 425, 435–436 (1924), but it did not do so. It argued only that the action was barred by the statute of limitations. The Court ruled for respondent, in any event, holding the action barred by the statute of limitations. Thus the statement in *Johnson* v. *Railway Express Agency* that § 1981 supplies a cause of action for a private racially motivated refusal to contract was dictum, made without benefit of briefs by the parties and without reference to the legislative history of § 1981 set forth above—as is demonstrated by the erroneous reference to the Thirteenth Amendment statute in the question on which certiorari was granted. The Court simply cited several Courts of Appeals' decisions each of which had erroneously assumed the legislative history of § 1981 to be identical to that of § 1982 and thus assumed the construction of § 1981 to be governed by this Court's decision in *Jones* v. *Alfred H. Mayer Co.*, *supra*.[16] Moreover, the dictum in *Johnson* v. *Railway Express Agency* is squarely contrary to the dictum in the *Civil Rights Cases*, 109 U. S. 3 (1883). The issue presented in this litigation is too important for this Court to let the more recent of two contradictory dicta stand in the way of an objective analysis of legislative history and a correct construction of a statute passed by Congress. Cf. *Jones* v. *Alfred H. Mayer Co.*, *supra*, at 420 n. 25.

Accordingly, I would reverse.

---

[16] *Tillman* v. *Wheaton-Haven Recreation Assn.*, 410 U. S. 431, 439–440 (1973), cited by the majority, contains no language, either dictum or holding, relevant to the issue in this case. The Court carefully held in that case solely that the respondent swimming club was not a private club under Title II of the Civil Rights Act of 1964, 42 U. S. C. § 2000a (e), and was not exempt as a private club from any cause of action based either on § 1981 or § 1982. No attempt is made in the opinion to state whether any cause of action existed under § 1981.