Sosman, J.
Plaintiff brought the present action claiming that defendants’ delay in reappointing him as staff psychiatrist following his stroke constituted a breach of contract, discrimination on the basis of age and handicap, and a violation of the Massachusetts Equal Rights Act. Defendants moved to dismiss the complaint in its entirety as to First Hospital Corporation of Boston and Heritage Mental Health Centers, Inc., and to dismiss the discrimination and Equal Rights Act claims as to all defendants. For the following reasons, the motion to dismiss is allowed in part and denied in part.
Facts
As set forth in plaintiffs amended complaint, plaintiff Joseph Greaney, M.D. is a licensed psychiatrist. He is seventy years old. On June 13, 1985, plaintiff became a staff psychiatrist at Heritage Hospital (then *664 known as Central Hospital) in Somerville, Massachusetts.
On February 29, 1992, Dr. Greaney suffered a cerebral hemorrhage which left him with a partial paralysis on his right side. He was on medical leave during his recuperation. On November 24, 1992, plaintiff filed an application for reappointment to the medical staff at Heritage Hospital. In early 1993, plaintiff made numerous attempts to check the status of his application. On March 16, 1993, he wrote to the hospital, advising that he would soon be ready to return to work and enclosing a letter from his treating physician opining that Dr. Greaney was able to resume his duties as a staff psychiatrist. Various persons at the hospital allegedly reassured the plaintiff regarding his application.
On May 11, 1993, the hospital’s executive director notified plaintiff that the hospital could not accommodate another psychiatrist, as it had lost a major contract and had experienced a drop in census. The letter also indicated that the hospital would need additional information in order to decide on Dr. Greaney’s request for reappointment, but did not specify what that information was.
On July 12, 1993, Dr. Bryant, the president of the medical staff, informed plaintiff that the Medical Staff Executive Committee had recommended denial of his application for reappointment, based upon past record delinquencies and the need to close out administratively certain of plaintiffs records following his illness. In an August 26, 1993 letter to Dr. Bryant, plaintiff responded, “I have been forced to conclude that the decision to terminate me is motivated by a combination of unlawful discrimination against me on account of my age and disability.”
On November 24, 1993, the hospital terminated the plaintiff. Plaintiff requested a hearing, pursuant to the hospital’s by-laws. A committee appointed by the hospital held hearings on April 11 and May 23, 1994, and rendered its decision on June 30, 1994, allowing plaintiffs reappointment.
On August 15, 1994, plaintiff returned to the hospital as a staff psychiatrist for twenty hours per week at an annual salary of $60,000. The hospital denied the plaintiffs requests to return full-time. Plaintiff claims that, following his return, the hospital failed and refused to accommodate his disability, and failed to grant him the employment terms, conditions and privileges available to other staff physicians.
On November 23, 1994, Heritage Hospital, Inc., the owner of Heritage Hospital, transferred its assets to its wholly owned subsidiary, Heritage Mental Health Center, Inc. On the same day, the shares of Heritage Mental Health Center, Inc. were sold to First Hospital Corporation of Boston. Until January 15, 1995, First Hospital Corporation operated Heritage Hospital through Heritage Mental Health Center, Inc. Thereafter, First Hospital Corporation managed and operated Heritage Hospital directly. Both Heritage Mental Health Center, Inc. and First Hospital Corporation continued to operate under the name of Heritage Hospital, utilizing the same medical staff and employees.
Procedural History
On May 20, 1994, plaintiff filed a complaint with the Massachusetts Commission against Discrimination (MCAD), alleging that the defendants discriminated against him on account of his age and handicap. On May 1, 1995, plaintiff filed this action, alleging that failure to reappoint him promptly constituted a breach of contract (Count I), unlawful discrimination on the basis of age and handicap in violation of G.L.c. 151B (Count II), and a violation of the Massachusetts Equal Rights Act, G.L.c. 93, §103 (Count III).[1] On June 8, 1995, the defendants moved to dismiss all counts of the complaint against First Hospital Corporation and Heritage Hospital Mental Health Center, Inc., and to dismiss the discrimination and Equal Rights Act claims against all defendants.
Discussion
When evaluating the sufficiency of a complaint pursuant to a motion to dismiss, the court must take as true the allegations of the complaint, and must draw any inferences from those allegations in the plaintiffs favor. Eyal v. Helen Broadcasting Corp., 411 Mass. 426, 429 (1991). A complaint is not subject to dismissal unless it could support relief under no theory of law. Whitinsville Plaza v. Kotseas, 378 Mass. 85, 89 (1979). The court should not dismiss the complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Nader v. Citron, 372 Mass. 96, 98 (1977), quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957).
I. Timeliness of plaintiffs claims under G.L.c. 151B
Defendants contend that plaintiffs discrimination claim (Count II) should be dismissed on the ground that it was not timely filed with the MCAD. A plaintiff bringing a discrimination claim under G.L.c. 151B must first file a complaint with MCAD within six months of the alleged discriminatory act. G.L.c. 151B, §5. Failure to comply with this requirement bars resort to the courts. Charland v. Muzi Motors, Inc., 417 Mass. 580, 583 (1994); Sereni v. Star Sportswear Mfg. Corp., 24 Mass.App.Ct. 428, 430, review den., 400 Mass. 1107 (1987). The six-month period begins to run when the plaintiff learns of the allegedly discriminatory act or conduct. See Wheatley v. American Tel. & Tel. Co., 418 Mass. 394, 397 (1994).
Where the conduct complained of is of a continuing nature, as plaintiff here asserts, the limitations period begins when conduct with a degree of permanence triggers plaintiffs awareness of and duty to assert his *665 or her rights. See Smith v. Bath Iron Works Corp., 943 F.2d 164, 166 (1st Cir. 1991). See also 804 C.M.R. §1.03(2). In order to determine whether the unlawful conduct is of a continuing nature, courts consider: (1) whether the acts involved the same type of discrimination; (2) whether the acts were recurring or isolated; and (3) whether the act had a degree of permanence which should trigger an employee’s awareness of and duty to assert his or her rights. Smith, 943 F.2d at 166.
In the present case, plaintiff filed his MCAD complaint on May 20, 1994, within six months of his termination notice of November 24, 1993. However, defendants argue that plaintiff knew of his claim on July 12, 1993, when the medical executive committee recommended denying his application. As evidence of plaintiffs knowledge, defendants point to an August 26, 1993 letter from plaintiff, in which plaintiff characterized defendants’ actions as discriminatoiy. Further, defendants submit a letter from plaintiffs counsel, dated October 6, 1993, which makes reference to the hospital’s “unfairly and illegally discriminating against an older physician returning from a medical leave of absence.”
These letters, however, came at a time when the medical staff executive committee had merely recommended that plaintiffs application be denied. The actual decision of the hospital’s governing board was not rendered until November 24, 1993. The committee’s recommendation, not yet acted on and still the subject of debate, did not have the degree of permanence necessary to trigger plaintiffs duty to assert his rights. The alleged discriminatory conduct continued during the application and review process, and the limitations period began to run when the defendants unequivocally denied Greaney’s application in November 1993. See Wheatley, 418 Mass. at 398 (unequivocal notice of discharge, not simply notice of position elimination With a possibility of transfer within same company, triggered running of limitations period). As such, plaintiffs MCAD complaint was timely filed.
II. Equal Rights Act, G.L.c. 93, §103
A. Exclusive remedy of G.L.c. 151B
Defendants move to dismiss plaintiffs Equal Rights Act claims on the ground that G.L.c. 151B provides the exclusive remedy for employment discrimination claims. “Where applicable, G.L.c. 151B provides the exclusive remedy for employment discrimination not based on preexisting tort law or constitutional protections.” Charland, 417 Mass. at 586.
Plaintiff concedes that he may not recover under both G.L.c. 151B and G.L.c. 93, §103. He argues, however, that he brought his Equal Rights Act claim as an alternative to his G.L.c. 151B claim, depending upon whether he is ultimately determined to be an employee or whether he is found to be an independent contractor. G.L.c. 151B applies to employees, not to independent contractors. Comey v. Hill, 387 Mass. 11, 15 (1982). The determination of plaintiffs status as either employee or independent contractor cannot be made from the face of the complaint. Plaintiff may proceed on alternative theories until such time as his status is resolved. If he is found to be an employee and thus covered by the exclusive remedy of G.L.c. 151B, his claims under the Equal Rights Act may be dismissed at that time.
B. Right to make and enforce contracts
Assuming that plaintiff is ultimately determined to be an independent contractor, defendants contend that plaintiff may still not bring an age or handicap discrimination claim under the Equal Rights Act. The Act provides:
Any person within the commonwealth, regardless of handicap or age as defined in [G.L.c. 151B) shall, with reasonable accommodation, have the same rights as other persons to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings for the security of persons and property, including, but not limited to, the rights secured under Article CXIV of the Amendments to the Constitution.
G.L.c. 93, §103(a). A literal interpretation of the right to “make and enforce contracts,” as urged by defendants, suggests that it contemplates only those disputes which occur at the formation of the employment contract, or those which occur when one seeks to enforce, in court or otherwise, the terms of an employment contract.
Defendants’ literal interpretation of the wording in the Equal Rights Act is supported by Patterson v. McLean Credit Union, 491 U.S. 164, 176-78 (1989), in which the Supreme Court, construing 42 U.S.C. §1981 (the federal analogue to G.L.c. 93, §102 and §103), held that “rights to make and enforce contracts” included only two work-related rights: (1) the right to enter into an employment contract, and (2) the right to enforce terms of such employment contract upon termination. Because racial discrimination alleged in Patterson was on-the-job racial harassment, the Court determined that §1981 provided no remedy. “[T]he right to make contracts does not extend, as a matter of either logic or semantics, to conduct by the employer after the contract relation has been established, including breach of the terms of the contract or imposition of discriminatory working conditions.” 491 U.S. at 177. And, “[t]he right to enforce contracts does not, however, extend beyond conduct by an employer which impairs an employee’s ability to enforce through legal process his or her established contract rights.” 491 U.S. at 177-78.
Concern over what the Supreme Court might decide in the Patterson case inspired the drafting of the Massachusetts Equal Rights Act. Massachusetts legislators and civil rights lawyers feared that Patterson would *666 overrule the holding of Runyon v. McCrary, 427 U.S. 160 (1976), which had established that §1981 applied to discriminatory actions in the private sector. Stephen P. Johnson, The 1989 Massachusetts “Equal Rights Law”: A Short History, 34 B.B.J. 17, 18-19 (March-April 1990). The goal in Massachusetts was to provide a statutory prohibition on discrimination in the private sector in order to preserve the relief that Runyon and its progeny had provided under 42 U.S.C. §1981. Id.
Patterson did not, however, erode the application of §1981 in the way that proponents of the then-proposed Massachusetts Equal Rights Act had feared. Patterson did not overturn the Runyon holding that §1981 applied to private actions.[2] 491 U.S. at 171-75. Instead, as discussed supra, Patterson addressed the limits of the term “rights to make and enforce contracts” in the context of claims alleging on-the-job discrimination and did not undermine Runyon in reaching that decision.
In the wake of Patterson, decided in June 1989, the Massachusetts legislature did nothing to change the pending Equal Rights Act’s reference to “rights to make and enforce contracts” to distinguish the Patterson interpretation of the identical language in §1981. See Howard v. Town of Burlington, 399 Mass. 585, 589 (1987) (“[ijn construing Massachusetts statutes, we are ordinarily guided by the construction given the parallel Federal statute by the Federal Courts”). Although G.L.c. 93, §102 was not enacted until one month after the Patterson decision was issued, the legislature failed to provide explicit language to ensure that the Equal Rights Act would apply to allegations of discrimination in the performance of contracts. The following year, when G.L.c. 93, §103 was enacted, the legislature still used the identical “make and enforce contracts” language that had already been interpreted by Patterson. Inasmuch as the pending Patterson case had been a major motivating factor behind the Equal Rights Act, the legislature’s failure to adopt language explicitly expanding the term “make and enforce contracts” is a strong indication that the legislature did not intend an interpretation other than that rendered by Patterson itself on that same issue.[3]
Two years after the Patterson decision, Congress expanded the definition of “make and enforce contracts” to include “the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship.” 42 U.S.C. § 1981 (b). Plaintiff argues that this court should simply read that same amendment into the state Equal Rights Act. To date, however, despite this readily available model draft from Congress, the state legislature has not acted to add any such expanded definition to the state’s Equal Rights Act. Thus, having not given any definition of “make and enforce contracts" beyond that provided by Patterson at the time the Equal Rights Act was passed, the state legislature has still not acted to adopt the language later enacted by Congress. If the legislature wishes to define “make and enforce contracts” in the expansive way that Congress has now done, it may do so. It is not up to the court to impose on the statute some amendment that the legislature has not seen fit to adopt.
Greaney claims that, during the period of his reapplication, he still had a contractual relationship with the hospital. He alleges no infringement of his right to “make” that contract, nor any infringement of his right to come to court and enforce the contract he had. As such, his complaint fails to state a claim for any violation of his right to “make and enforce contracts” under G.L.c. 93, §103.
C. Rights secured under Article 114
With respect to the handicap discrimination portion of plaintiffs Equal Rights Act claim, the statute expressly includes the right provided by Article 114 of the Amendments to the Massachusetts Constitution as one of the rights that may be enforced through the procedures provided in the Equal Rights Act. The Act grants any person “the full and equal benefit of all laws and proceedings for the security of persons and property, including but not limited to, the rights secured under Article CXIV of the Amendments to the Constitution.” G.L.c. 93, §103(a).
Article 114 provides as follows:
No otherwise qualified handicapped individual shall, solely by reason of his handicap, be excluded from the participation in, denied the benefits of, or be subject to discrimination under any program or activity within the Commonwealth.
Massachusetts courts have yet to decide whether Article 114 applies to the conduct of private parties. See Layne v. Superintendent, Massachusetts Correctional Institution, Cedar Junction, 406 Mass. 156, 159, n. 3 (1989). However, from both the language and legislative history, it appears that Article 114 does apply to private conduct. The amendment proscribes handicap discrimination “under any program or activity within the Commonwealth.” The use of the term “within” implies some physical location within the Commonwealth. If the amendment were addressed solely to state action, or solely to programs that had some connection .with state or local government, other language would surely have been chosen.
The text of Article 114 was modeled largely on the federal Rehabilitation Act of 1973, with one major exception. The federal statute provided:
No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial as *667 sistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.
Pub. L. No. 93-112, §504, 87 Stat. 355, 384, codified as amended at 29 U.S.C. §794(a). Working from a federal model that was expressly limited to specified types of government action, the legislature’s deletion of that limiting language from the state’s Article 114 and the substitution of the far broader specification that the program or activity be merely “within the Commonwealth” suggests a deliberate choice to expand the reach of Article 114 to private conduct and not just state-sponsored programs or activities.
Where Article 114 proscribes handicap discrimination in any “program or activity within the Commonwealth,” and where the state Equal Rights Act provides a procedural mechanism for enforcing the rights secured by Article 114, plaintiff may bring a claim under the Equal Rights Act for alleged handicap discrimination in his dealings with Heritage Hospital.[4]
III. Successor liability of First Hospital Corporation and Heritage Hospital Mental Health Center, Inc.
Plaintiff alleges that First Hospital Corporation and Heritage Hospital Mental Health Center, Inc. have liability on each of the counts of his complaint as successors to Heritage Hospital, Inc. In their motion to dismiss, defendants argue that the terms of the transaction by which the hospital’s assets were transferred specified that First Hospital Corporation and Heritage Mental Health Center, Inc. acquired only the assets and assumed none of the liabilities of Heritage Hospital, Inc. (other than certain specifically enumerated loan obligations).
While the documented terms of the transaction are certainly an important factor in considering whether to impose successor liability, they do not automatically prevent a plaintiff from showing the presence of other factors sufficient to impose such liability. Successor liability is a factual issue inappropriate for resolution on a motion to dismiss. See McCarthy v. Litton Industries, Inc., 410 Mass. 15, 21, 23 (1991). Plaintiffs complaint alleges at least some facts that would arguably give rise to successor liability — e.g., operation of the hospital under the same name, on the same premises, with the same employees as the prior owner. The defendants have not shown that there is no set of facts that could support plaintiffs claim of successor liability.
ORDER
For the foregoing reasons, it is hereby ORDERED that Defendants’ motion to dismiss is GRANTED with respect to so much of Count III as alleges age discrimination and is DENIED in all other respects.

On August 11, 1995, plaintiff filed an amended complaint, which added Count IV alleging violation of G.L.c. 93A, §11, Count V seeking to reach and apply the shares of Heritage Mental Health Center, Inc. and amounts allegedly owed to Heritage Hospital Inc., and Count VI seeking the appointment of a receiver for Heritage Hospital.

The Patterson decision did not make the proposed state statute useless or unnecessary. Whereas §1981 had addressed only racial discrimination, the Equal Rights Act included sex, color, creed and national origin as protected categories in §102 and age and handicap as protected categories in §103.

Because the Equal Rights Act received quick approval by both houses of the Massachusetts legislature, there is no “official” legislative history (i.e., no floor debate regarding the language and purpose of the statute) to guide this court’s interpretation of the “make and enforce contracts" language. Stephen Johnson, former legislative counsel for the Boston Bar Association, served on the BBA’s seven-member committee assembled to draft and promote legislation in anticipation of the Patterson decision. Johnson’s Boston Bar Journal article, supra, summarizes the events surrounding the drafting and proposal of the Equal Rights Act, up to its speedy enactment on July 19, 1989. As Johnson’s article explains, many civil rights lawyers and legal scholars involved in drafting the Equal Rights Act and getting it through the legislature expressed their hope and expectation that the Act would be interpreted to provide new and expansive remedies. (In many other respects, the Equal Rights Act does contain express provisions that go beyond then existing federal civil rights and equal rights law.) However, that commentary from outside proponents of the bill is not “legislative history” and is of extremely limited value in determining the legislature’s intent, particularly in the face of the legislature’s failure to adopt more expansive terminology following the Patterson definition of “make and enforce contracts.” As such, this court is not persuaded that the “legislative history” of the Equal Rights Act compels the court to abandon the ordinary canons of statutory construction and adopt an interpretation contrary to the federal interpretation of identical language in 42 U.S.C. §1981.

Plaintiff argues that, because his handicap discrimination claim may be brought under the Equal Rights Act, his claim for age discrimination should also be allowed to go forward under the Equal Rights Act so that the two types of discrimination will be handled consistently. The history of both federal and state anti-discrimination laws is replete with examples of differing substantive and procedural provisions for differing types of discrimination. Some of those differences appear to reflect conscious policy decisions relating to the unique problems associated with particular protected classes of persons. Others appear to be inadvertent artifacts of draftsmanship. While a single, comprehensive, uniform and consistent approach to anti-discrimination legislation might be desirable from a policy point of view, the fact remains that problems of discrimination have been addressed by differing acts passed during different sessions with differing language. It is not up to the court to simply ignore those drafting differences and impose its own uniform approach on the legislative patchwork that makes up our anti-discrimination statutes and amendments. In the present case, plaintiffs claim for handicap discrimination is aided by a state constitutional amendment on the subject that has been expressly incorporated into the Equal Rights Act. There is no constitutional amendment covering age discrimination, let alone any that is referenced in the Equal Rights Act. That plaintiff has somewhat different procedural avenues for the redress of handicap discrimination as opposed to age discrimination should not be a surprising result.