Zobel, J.
Defendants having terminated Plaintiff from a doctoral program at the Harvard Graduate School of Education, she now alleges discrimination based on failure to accommodate a physical handicap, G.L.c. 93, §103, and for discrimination on the basis of physical or mental disability, G.L.c. 272, §98.
The Harvard Graduate School of Education (“HGSE”), an academic unit within Harvard University (“Harvard”), is a private institution of higher education, offering instruction in (among other fields) Administration, Planning and Social Policy (“APSP”).
APSP doctoral students may select from among six specialized course concentrations. One, the Urban Superintendents Program (“USP"), is an intensive reg *692 imen preparing individuals for top leadership positions in big-city school systems.
To remain in APSP, a student must maintain an overall B-plus average. Retention also depends on: (a) faculty evaluation of student performance; and (b) faculty assessment of the student’s capacity for undertaking a dissertation. APSP faculty may also place a student on academic probation if the student's lack of progress warrants. Finally, the faculty may terminate a student from APSP for failure to improve.
Defendants Robert Peterkin (“Peterkin”) and Linda Wing (“Wing”) are lecturers and co-directors of the USP; they teach a course called Professional Seminar (“Proseminar”), required for all students in the USP. Any participant achieving a grade of B plus or better may take a six-month internship in an urban school district.
In July 1996, Plaintiff (“Haskins”) enrolled as an APSP doctoral candidate in the USP. During the summer and fall terms 1996, she experienced academic difficulties, failing a midterm examination in Microeconomics. The quality of Haskins’ work in Proseminar also troubled Peterkin and Wing.
On February 28, 1997, the APSP faculty sent Has-kins a “letter of concern," indicating uneasiness about her ability to complete course work and a dissertation. Haskins continued to perform poorly in the spring of 1997; her grades were even lower than in preceding terms.
Before arriving at Harvard in 1996, Haskins had undergone abdominal surgery. As a result, while there, she experienced muscle weakness in her legs and tingling in legs and fingers. She does not, however, contend that these symptoms constitute the disability that is the subject of the present dispute.
In the spring of 1997, although Haskins disclosed to Peterkin and Wing a medical problem necessitating further surgery, she did not reveal the diagnosis (“possible multiple sclerosis”). To accommodate her need for surgery, Peterkin, Wing, and Haskins agreed that Haskins would take the 1997 summer term off, and that she would receive an “incomplete” in Proseminar.
To complete the USP, Peterkin and Wing advised that Haskins: (a) postpone the required internship to the Spring 1998 semester; (b) enroll in certain academic courses during the Fall 1997 semester; and (c) finish Proseminar on an independent study basis. Haskins would have until December 18, 1997 to complete the final Proseminar paper, and would have to earn at least a B plus to advance to the internship.
Professor Richard Murnane (“Murnane”), APSP Chair, approved the Peterkin-Wing recommendation.
During the 1996-97 school year, Haskins’ barely maintaining the required B plus average caused the APSP faculty to doubt her ability to undertake a dissertation; she went on academic probation in June 1997.
At this point, no one at HGSE knew that Haskins might have been diagnosed with multiple sclerosis. However, on September 25, 1997, Anna L. Davol. M.D., wrote Murnane informing him of the 1993-1994 diagnosis. In early October 1997, Peterkin and Wing both received a copy of Dr. Davol’s letter. It is this diagnosis which Haskins contends renders her a disabled person.
Up to this point, Haskins had not requested any accommodation to help her meet the USP academic standards. She continued, however, to perform poorly in her course work during the fall of 1997.
Peterkin determined that it was “impossible and impractical” for Haskins to continue in the USP, a conclusion he reached before Haskins had completed some of her fall courses and before she had turned in her Proseminar final paper.
Meeting on December 3, 1997 with Haskins and Wing, Peterkin informed Haskins that she could not continue in the USP and would not receive a stipend for an internship.
At a faculty meeting on January 26, 1998, the APSP faculty voted to terminate Haskins’ enrollment. Nonetheless, at the request of Haskins’ faculty advisor, Professor Charles Willie (“Willie”), the faculty deferred the termination pending an exploration with Haskins of other options.
Accordingly, Murnane arranged a meeting with Haskins and Willie at which he proposed that Haskins take a medical leave of absence and return to complete the remaining course work and dissertation required for a doctoral degree in the APSP core program, as opposed to the specific USP concentration.
When Haskins asked why she could not remain in the USP, Murnane said that Peterkin informed him that Haskins had been terminated from the USP because she was not physically able to go on an internship.
On January 28, 1998, Peterkin and Wing notified Haskins that, based upon her final paper in Proseminar-, she had received a final grade of B in the class, although they described the paper as the best piece of work she had done for Proseminar. However, because her grade was below B plus, she was ineligible for the USP internship.
On February 6, 1998, Haskins met with Peterkin and Wing to clarify her status in the USP. They told her that because of her grades in Proseminar and other courses she could not continue in the USP.
On April 13, 1998, Haskins informed Murnane by letter that she was prepared to take a one-semester medical leave, but that she wanted to complete the USP upon her return and would do whatever was necessary to complete the USP, including retaking courses.
Haskins’ medical leave was approved in May 1998. She has not since returned to Harvard.
*693 By statute, G.L.c. 272, §98, Massachusetts prohibits discrimination based on physical disability in any “place of public accommodation, resort or amusement," i.e., “any place, whether licensed or unlicensed, which is open to and accepts or solicits the patronage of the general public,” G.L.c. 272, §92A. The statute provides a nonexclusive list of examples, without limiting the generality of the definition. See id.
Because this statute is broadly remedial in purpose, courts should not read the list of examples narrowly. See, Local Finance Co. v. Massachusetts Commission Against Discrimination, 355 Mass. 10, 13 (1968). The principles of ejusdem generis and noscitur a sociis do not apply. See, id. Even so, the list of examples patently does not include anything akin to educational facilities or academic programs. This should be compared with the Americans With Disabilities Act, 42 U.S.C. §12181(7)(J) (1995), which specifically defines public accommodation to include secondary, undergraduate, and post-graduate private schools. A court cannot read into the statute a provision which the Legislature did not put there, whether the omission was inadvertent or on purpose. Bronstein v. Prudential Insurance Co. of America, 390 Mass. 701, 706 (1984).
In determining whether a facility qualifies as a place of public accommodation, the most important factor is the selectivity of membership. See, Alperin & Shubow, Summary of Basic Law §5.31, at 550 (1996). Absent genuine selectivity in choosing members, even a private club can fall within the ambit of the Public Accommodations Act. See, Concord Rod & Gun Club, Inc. v. Massachusetts Commission Against Discrimination, 402 Mass. 716, 721 (1988). Although Harvard accepts applications for admittance from the general public, it admits only a small fraction óf applicants. The unsuccessful majority (like the rest of the public) is then excluded. Thus Harvard is not a place of public accommodation within the meaning of the statute.
No Massachusetts appellate court has held that a private educational institution such as Harvard is a “place of public accommodation, resort, or amusement.” Indeed, the Massachusetts Commission Against Discrimination has held that a public high school is not a place of public accommodation within the statutory meaning. G.L.c. 272, §§92A, 98; see, Beagan v. Falmouth School Department, 9 MDLR 1209, 1214 (1987). Moreover, under a similar public accommodations statute, a public university has been held not to come within the charmed circle. Board of Trustees of Southern Illinois University v. Department of Human Rights, 636 N.E.2d 528, 531 (Ill. 1994).
Harvard is not a place of public accommodation, and is thus immune to suit under the Public Accommodations Act.
Haskins has also invoked the Massachusetts Equal Rights Act (“MERA”), G.L.c. 93, §103(a):
Any person within the commonwealth, regardless of handicap or age as defined in chapter one hundred and fifty-one B, shall, with reasonable accommodation, have the same rights as other persons to make and enforce contracts, inherit, purchase, lease, sell, hold and convey real personal property, sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of person and property, including, but not limited to, the rights secured under Article CXIV of the Amendments to the Constitution.
The legislature enacted MERA in 1989, replicating the federal analogue, 42 U.S.C. §1981, which at that time included the same “make and enforce contracts” language. Section 1981 prohibits discrimination in the making and enforcing of contracts in private schools. See, Runyon v. McCrary, 427 U.S. 160, 172 (1976). The contract provision of MERA, which does not limit the context of protection, applies to private educational institutions such as Harvard. See, Alperin & Shubow, Summary of Basic Law, supra, §5.41, at 554 n.4.
MERA was enacted shortly after the decision in Patterson v. McLean Credit Union, 491 U.S. 164, 176 (1989), holding that §1981 provides no relief if the alleged discriminatory act does not involve the making or enforcement of a contract. Because MERA passed through the legislature quickly, no legislative history can assist the exegesis of “make and enforce contracts.” See, Greaney v. Heritage Hospital, Inc., 4 Mass. L. Rptr. 663, 1995 WL 1146185, at *5 n.3 (Mass. Super. 1995).
When construing Massachusetts statutes, Massachusetts courts ordinarily follow federal court construction of analogous federal statutes. Howard v. Burlington, 399 Mass. 585, 589 (1987):
Inasmuch as the pending Patterson case had been a major motivating factor behind the Equal Rights Act, the legislature’s failure to adopt language explicitly expanding the term “make and enforce contracts” is a strong indication that the legislature did not intend an interpretation other than that rendered by Patterson itself on the same issue.
Greaney v. Heritage Hospital, Inc., supra, at *5; see also, Titcomb v. Boston Safe Deposit & Trust Co., 1993 WL 1377506, at *3 (Mass. Super. 1993).
Two years after Patterson, Congress amended §1981 so that the “make and enforce contracts” language specifically included “the making, performance, modification, and termination of all benefits, privileges, terms and conditions of the contractual relationship.” 42 U.S.C. §1981(b). Despite this change, the Massachusetts legislature has not taken any corresponding action to amend the MERA’s cognate language. Courts “will not add to a statute a word that the Legislature had the option to, but chose not to, include.” Dartt v. Browning-Ferris Industries, Inc., 427 Mass. 1, 9 (1998). Because the legislature has chosen *694 not to amend MERA, Patterson’s interpretation of the statutory language continues to guide this Court.
Haskins entered into a contractual relationship with Harvard by which Harvard received tuition. The record contains no evidence that Harvard discriminated against Haskins because other multiple sclerosis or because she used the legal process to enforce whatever contractual rights she possessed. The “contract” provision of MERA thus gives Haskins no relief.
Haskins also invokes MERA’s assurance of “full and equal benefit of all laws.” This language, she argues, specifically summons the protections provided by Article 114 of the Amendments to the Massachusetts Constitution. See, G.L.c. 93, §103(a). Article 114 provides that “[n]o otherwise qualified handicapped individual shall, solely by reason of his handicap, be excluded from the participation in, denied the benefits of, or be subject to discrimination under any program or activity within the commonwealth” (emphasis added).
This broad language covers private discrimination, as well as governmental discrimination. See, Mass. Const. Art. Amend. 114; Guckenberger v. Boston University, 957 F.Sup. 306, 324 (D.Mass. 1997). Massachusetts courts have not decided whether Article 114 confers a private right of action. See, Layne v. Superintendent, Massachusetts Correctional Institution, Cedar Junction, 406 Mass. 156, 159 n.3 (1989); Greaney v. Heritage Hospital, Inc., supra, at *6. This Court need not decide the issue, however, because MERA specifically grants the Article 114 right claimed here. See, G.L.c. 93, §103(a).
Genuine issues of material fact exist as to whether Peterkin and Wing terminated Haskins from the USP because of her course performance, or discriminated against her because of her possible multiple sclerosis. Summary judgment is thus inappropriate.
ORDER
Accordingly, it is Ordered that Defendants’ Motion for Summary Judgment be, and the same hereby is, Allowed with respect to any claim under the Public Accommodations Statute, G.L.c. 272, §98, or the contract provision of the Massachusetts Equal Rights Act, G.L.c. 93, §103; and it is Further Ordered, that the said Motion be, and the same hereby is, in all other respects, Denied.