Brassard, J.
This case arises out of alleged gender discrimination against plaintiff Nan Sabel (“Sabel”) by defendants Barry Armstrong (“Armstrong”), New England Advisory Group, Inc. (“NEAG”), 1717 Capital Management Company ("1717”) and Provident Mutual Life Insurance Company (“Provident”) (collectively “defendants”). Specifically, Sabel has brought claims alleging gender discrimination and retaliation in violation of G.L.c. 15 IB (Count I) as to all defendants, gender discrimination and retaliation in violation of G.L.c. 93, §102 (Count II) as to all defendants, and intentional infliction of emotional distress (Count IV)[2] as to all defendants. Defendants now move for summary judgment on all counts pursuant to Mass.R.Civ.P. 56. For the following reasons, defendants’ motion for summary judgment is ALLOWED in part and DENIED in part.
*6 BACKGROUND
From 1994 until February 2000, Sabel worked as a financial planner at NEAG[3] in Newton, Massachusetts. In November 1996, a contest at NEAG was held to fill three available private offices. In order to be awarded a private office, an agent had to have the highest insurance sales for the time period of December 1, 1998 through February 28, 1999. In March 1999, Sabel was awarded a private office after having one of the highest insurance sales record at NEAG. To maintain this private office, agents had to achieve $46,000 in weighted commissions per year.
Defendants contend that Sabel failed to close any sales between March 1999 and August 1999, and as such, was told that her sales level had to improve or she would forfeit her office. Defendants also contend that they sent this exact same message to Mai Jacobs, a male financial planner at NEAG. Sabel asserts that the male financial planners who received offices were given greater leeway with respect to both the date that they had to satisfy the commission goal in order to maintain their private offices as well as the amount of commissions needed to satisfy the goal. Sabel asserts that NEAG was firm with her date and that she was removed from her private office in September 1999, because she had not reached the weighted commissions goal.
After being removed from her private office, Sabel filed a complaint internally with Provident. After investigating, Provident determined that the decision reflected no bias and conveyed its reasoning and conclusions to Sabel. Sabel alleges that male financial employees were given private offices, in addition to larger cubicles, despite the fact that they all failed to meet stated company commission goals. Sabel contends that her name and biography were taken off the NEAG’s website sometime between January 1 and February 9, 2000. NEAG contends that this removal was due to the fact that Sabel failed to join the newly formed NEAG, LLC and that both men and women failing to join were removed from the website. Sabel asserts that men who failed to join NEAG, LLC still remained on the company’s website.
On February 4, 2000, Sabel alleges that Armstrong took her into a private office and threatened to fire her and “bad mouth” her to her clients if she commenced any legal action with respect to the alleged incidents of sex discrimination. On February 10, 2000, Sabel resigned her position at NEAG.[4]
DISCUSSION
I. Standard of Review
Summary judgment is appropriate when no material facts are in dispute and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56 (c); Highlands Ins. Co. v. Aerovox, Inc., 424 Mass. 226, 232 (1997). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and showing that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). If the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a material fact in order to defeat the motion. Pederson, 404 Mass. at 17.
II. G.L.c. 151B
To prevail on a claim under G.L.c. 151B, Sabelmust be an employee of defendants and not an independent contractor. See Comey v. Hill, 387 Mass. 11, 15(1982) (holding that ”[i]n the absence of any indication to the contrary, we will not assume that the Legislature intended to cover relationships outside the traditional common law employer-employee relationship”). In Chase v. Independent Practice Ass’n, Inc., 31 Mass.App.Ct. 661, 665 (1991), the Appeals Court held that:
In the employment context, a master-servant relationship is determined by a number of factors, including the right of the employer to control the details of the work done by the employee, the method of payment, the skill required in the particular occupation, whether the employer supplies the tools, instrumentalities and place of work, as well as the parties’ own belief as to whether they are creating a master-servant relationship.
Id. at 665 (citations omitted).
Defendants assert that they did not control Sabel’s business as she was free to organize and execute her business as she saw fit. Specifically, defendants assert that Sabel set her own hours, received compensation based on her sales of insurance and securities, paid rent for her office space, purchased her own supplies, hired and paid her own assistant, was free to sell policies and securities of companies other than Provident, and did not have income taxes withheld from her commission check. Further, defendants argue that the Provident Career Agent Agreement signed by Sabel provides that “in performing his or her duties under this Agreement, the Career Agent shall act as an independent contractor and not as an employee of the Company.” The 1717 Registered Representative Agreement, also signed by Sabel provides that “(t]he Representative’s relationship with the Company shall be that of independent contractor, and nothing contained in this Agreement shall be construed to create the relationship of employee and employer between the parties.” Defendants contend that the language of these agreements evidence the fact that Sabel was an independent contractor and not an employee.
Sabel asserts that she was in fact an employee of defendants, and points out that she was required to be at her desk by 8:00 a.m. to prepare for appointment phone calls. In addition, Sabel asserts that she was required to participate in all Monday and Thursday weekly meetings, and was required to meet certain appointment numbers and report them to her sales *7 manager. Sabel argues that she was not allowed her own choice of computer software to produce financial plans, and had to use a program provided by defendants. Further, Sabel argues that defendants supplied a fax machine, phone system with voice mail for the entire office, copy machines, insurance regulatory books, tax facts books, postage supplies, and securities prospectuses and forms. Defendants also provided insurance assistants to all agents to process applications. Sabel also points to the fact that she was required to sell a specific amount of Provident Mutual products and was not allowed to sell certain insurance products for variable life insurance. Sabel participated in Provident Mutual’s pension plan, 401(k) plan, and a group health and dental plan. Sabel points to documents stating that these plans were “for employees.of Provident Mutual.” In addition, Sabel had a vesting schedule and received a W-2 form from defendants.
Defendants argue that Sabel’s participation in the benefit programs does not alter her status as an independent contractor. Defendants specifically point out that pursuant to 26 U.S.C. §§3321(d)(3)(b) and 77091(a)(20), insurance agents are “statutory employees” and thus may be included in group insurance and retirement plans while having social security taxes withheld from commissions.
In Cowan v. Eastern Racing Ass’n, Inc., 330 Mass. 135, 141 (1953), the Supreme Judicial Court stated that:
Although the conclusive test of the relationship of master and servant is the right of control, other factors may be considered in determining whether the right to control exists, but they are subordinate to this primary test. This court has held that the method of payment is not the decisive test . . . Neither is the fact that . . . [one] was an employee of the defendant and had no other employment decisive, for a person may be an agent or servant as to one part of an undertaking, and an independent contractor as to other parts . . . Likewise it is the right of control rather than the exercise of it that is the test. . .
Id. at 141 (citations omitted).
Furthermore, in Cowan, the Supreme Judicial Court held that, “[w]here more than one conclusion is possible, the question is for the jury.” Id. at 142.
In the instant case, there are disputed issues of fact as to defendants’ right of control over Sabel. Accordingly, a question for the jury remains as to whether Sabel was an employee of defendants or an independent contractor. If the jury finds that Sabel was an employee of one or more of the defendants, then recovery under G.L.c. 151B is available against that defendant(s). However, if the jury determines that Sabel was an independent contractor, she is barred from recovery based on the language of G.L.c. 151B and applicable case law. See Comey, supra, at 15. Therefore, defendants’ motion for summary judgment as to Count I is DENIED.
III. G.L.c. 93, §102
Sabel’s second count in her complaint alleges violation of G.L.c. 93, §102, the Massachusetts Equal Rights Act (“MERA”).
General Laws chapter 93, section 102 provides, in pertinent part:
All persons within the commonwealth, regardless of sex, race, color, creed or national origin, shall have, except as is otherwise provided or permitted by law, the same rights enjoyed by white male citizens, to make and enforce contracts, to inherit, purchase, to lease, sell, hold and convey real and personal property, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
Massachusetts case law holds that, “where applicable, G.L.c. 151B provides the exclusive remedy for employment discrimination not based on preexisting tort law or constitutional protections.” Charland v. Muzi Motors, Inc., 417 Mass. 580, 586 (1994).[5]
Defendants argue that a literal interpretation of the right to “make and enforce contracts” applies to only those disputes which occur at the formation of the employment contract, or those disputes that occur when one exercises the right to enforce the underlying terms of the contract upon termination.
In Greaney v. Heritage Hospital, 1995 WL 1146185, at *4, 4 Mass. L. Rptr. 663, this court (Sosman, J.), engaged in a thorough and complete analysis of MERA and its federal counterpart, 42 U.S.C. §1981.[6] In Greaney, this court concluded that in Patterson v. McClean Credit Union, 491 U.S. 164, 176-78 (1989), the Supreme Court of the United States, in construing 42 U.S.C. §1981 (the federal analogue to G.L.c. 93, §102 and §103), held that “rights to make and enforce contracts” included only two work-related rights: (1) the right to enter into an employment contract, and (2) the right to enforce terms of such employment contract upon termination. Greaney, supra, at *4. Patterson involved alleged racial discrimination that occurred on-the-job, and as such, the Court held that 42 U.S.C. §1981 provided no remedy. Specifically the Court stated:
[T]he right to make contracts does not extend, as a matter of either logic or semantics, to conduct by the employer after the contract relation has been established, including breach of the terms of the contract or imposition of discriminatory working conditions.
Patterson, supra, at 177.
The Court also stated that:
*8 The right to enforce contracts does not, however, extend beyond conduct by an employer which impairs an employee’s ability to enforce through legal process his or her established contract rights.
Id. at 177-78.
Concern over what the Supreme Court might decide in the Patterson case inspired the drafting of MERA. Greaney, supra, at *4. Massachusetts legislators and civil rights lawyers feared that Patterson would overrule the holding of Runyon v. McCrary, 427 U.S. 160 (1976), which had established that 42 U.S.C. §1981 applied to discriminatory actions in the private sector. Id. at *4, citing Stephen J. Johnson, The 1989 Massachusetts “Equal Rights Law”: A Short History, 34 B.B.J. 17, 18-19 (March-April 1990). The goal in Massachusetts was to provide a statutory prohibition on discrimination in the private sector in order to preserve the relief that Runyon and its progeny had provided under 42 U.S.C. §1981. Greaney, supra, at *4, citing Stephen J. Johnson, The 1989 Massachusetts “Equal Rights Law”: A Short Histoiy, 34 B.B.J. 17, 18-19 (March-April 1990).
The Supreme Court’s holding in Patterson did not overturn Runyon and held that 42 U.S.C. §1981 still applied to private actions. Greaney, supra, at *5. Patterson simply addressed the issue of the interpretation of the term “rights to make and enforce contracts” in the context of claims alleging on-the-job discrimination. Id. at *5.
The Massachusetts legislature, however, did nothing to change the pending Equal Rights Act’s reference to “rights to make and enforce contracts” to distinguish the Patterson interpretation from the identical language in 42 U.S.C. §1981. Id. at *5, citing Howard v. Town of Burlington, 399 Mass. 585, 589 (1987) (holding that ”[i]n construing Massachusetts statutes, we are ordinarily guided by the construction given the parallel Federal statute by the Federal Courts”). Although G.L.c. 93, §102 was not enacted until one month after the Patterson holding was issued, the legislation did not include explicit language to the effect that MERA would apply to allegations of discrimination in the performance of contracts. Greaney, supra, at *5. The following year, when G.L.c. 93, §103 was enacted, the legislature still used the identical “make and enforce contracts” language that had already been interpreted by Patterson. Id. at *5. Therefore, since the pending Patterson case had been a major factor motivating the enactment of MERA, the legislature’s failure to adopt language explicitly expanding the term “make and enforce contracts” is a strong indication that the legislature did not intend an interpretation other than that rendered by Patterson itself on that same issue. Id. at *5.
Two years after the Patterson holding, Congress expanded the definition of “make and enforce contracts” to include “the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms and conditions of the contractual relationship.” Id. at *5, citing 42 U.S.C. §1981(b). The Massachusetts Legislature has not acted to expand the terms under MERA to mimic the interpretation provided by Congress. Greaney, supra, at *5. Therefore, not having given any definition of “make and enforce contracts” beyond that provided by Patterson at the time MERA was enacted, the legislature has clearly not adopted the language later enacted by Congress. Id. at *5. The Massachusetts Legislature is free at any time to amend MERA to define “make and enforce contracts” consistent with the definition provided by Congress. However, it is not the province of this court to amend MERA on behalf of the legislature. Id. at *5. Accordingly, Sabel has failed to point to any discriminatory action in the making and enforcing of her contract with defendants. Defendants’ motion for summary judgment as to Count II is ALLOWED.
IV. Intentional Infliction of Emotional Distress[7]
Sabel asserts that on February 4, 2000, Armstrong escorted her into a private office where he threatened to “bad mouth” her to all of her clients and to fire her if she instituted legal action against him.
To prevail on a claim for intentional infliction of emotional distress, Sabel must show that: 1) Armstrong intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; 2) the conduct was “extreme and outrageous,” was “beyond all possible bounds of decency” and was “utterly intolerable in a civilized community”; 3) Armstrong’s actions caused Sabel’s distress; 4) the emotional distress Sabel sustained was “severe” and of a nature “that no reasonable man could be expected to endure it.” See Agis v. Howard Johnson Co., 371 Mass. 140, 144-45 (1976). The United States Court of Appeals for the First Circuit has held that a court can assess the “extreme and outrageous” element of this tort on a summary judgment motion. Caputo v. Boston Edison Co., 924 F.2d 11, 14 (1st Cir. 1991).
The defendants here urge that, Armstrong’s alleged conduct cannot be characterized as extreme and outrageous in light of Massachusetts appellate authority. See Foley v. Polaroid Corp., 400 Mass. 82, 97-100 (1987) (holding that forcing an employee, who had been acquitted of sexual harassment charges, to sit at a desk in the hallway was not extreme and outrageous); Bernard v. Cameron & Colby Co., 397 Mass. 320, 323-24 (1986) (holding that assignment of employee allergic to tobacco smoke to an office where co-workers were allowed to smoke was not extreme and outrageous); Richey v. American Automobile Ass’n, Inc., 380 Mass. 835, 839 (1980) (holding that employer’s decision to fire employee after several absences from work was not extreme and outrageous even though it could have been considered unfair given employee’s medical condition).
*9 Sabel, however, points to the case of Boyle v. Wenk, 378 Mass. 592, 595-97 (1979) (holding that a claim for intentional infliction of emotional distress should be assessed by examining the totality of the circumstances). The facts relied upon by Sabel present a close case, one better adjudicated after a full presentation of the evidence at trial. Accordingly, defendants’ motion for summary judgment as to Count TV is DENIED.
ORDER
For the foregoing reasons, defendants’ motion for summary judgment is DENIED as to Count I and Count IV and ALLOWED as to Count II.

 Sabel’s complaint does not contain a third count, but instead contains a first, second, and fourth count. For purposes of this motion, this court addresses the counts as labeled by plaintiff and assumes that plaintiffs counsel intended Count IV to be labeled as Count III.

 While the parties' submissions are unclear as to the relationship between Sabel and the defendants, at the hearing the parties stated that NEAG is a financial planning company that sells life insurance through Provident. Armstrong is the General Agency Manager for NEAG. It should be noted that all defendants are currently represented by the same attorney.

 Sabel also alleges that she was required to host a radio show five days a week instead of three days a week. She further alleges that this radio show took place on a radio station owned by Armstrong’s wife. Specifically, Sabel contends that Armstrong mandated that she host the show five days a week instead of three days a week, the latter being the amount of time agreed to by Sabel.

 The SJC has held that a claim under G.L.c. 93, §102 is not barred as long as the plaintiff commencing suit has complied with the procedural requirements of G.L.c. 151B. See Jancey v. School Comm. of Everett, 421 Mass. 482, 498 n.14 (1995). In essence, a plaintiff may not circumvent the statutory requirements of G.L.c. 151B by simply asserting a G.L.c. 93, §102 claim. See id. at 498 n. 14. Therefore, having satisfied the requirements under G.L.c. 151B, Sabel can seek relief alternatively under G.L.c. 93, §102. However, based on the following discussion, it is clear that Sabel’s claim under G.L.c. 93, §102 is ripe for summary judgment.

 The analysis by Justice Sosman with respect to this issue is adopted in the instant case.

 While Sabel's complaint alleges a claim for intentional infliction of emotional distress against all defendants, only conduct as to Armstrong is pled in the complaint, and as such, this court will address this claim only as it applies to Armstrong.